FEDERAL DEPOSIT INSURANCE
CORP., Appellant,

v.

SEA PINES COMPANY, Appellee.

No. 81–2134.

United States Court of Appeals,
Fourth Circuit.

Argued May 4, 1982.

Decided Oct. 28, 1982.

Rehearing and Rehearing En Banc
Denied Dec. 8, 1982.

J. Randolph Pelzer, Pelzer & Chard, P.C.,
Federal Deposit Insurance Corp., Charleston, S.C., for appellant.

H. Brewton Hagood, Morris D. Rosen,
Charleston, S.C., Barry L. Johnson, Joab M.
Dowling, Beaufort, S.C., for appellee.

Before HALL and SPROUSE, Circuit
Judges, and DOUMAR *, District Judge.

DOUMAR, District Judge:

This matter is on appeal from the decision of the District Court for the District of
South Carolina, wherein the plaintiff/appellant, the Federal Deposit Insurance Corporation (FDIC) alleged that Sea Pines Company, the parent, guaranteed a particular
indebtedness of its subsidiary, Point South,
Inc., to the American Bank & Trust Company (AB & T), the predecessor in interest to
FDIC.    Alternatively, FDIC sought to
pierce the corporate veil of Point South,
Inc.   The Court held that Sea Pines Company, the parent, did not guarantee the particular indebtedness.   The District Court
also concluded that the actions of the parent through the subsidiary were neither
unjust nor fundamentally unfair and therefore declined to pierce the corporate veil.
We reverse and remand.

Point South, Inc. was one of a number of
subsidiary corporations utilized by the parent, Sea Pines Company.   Point South, Inc.
was initially capitalized with $1,000 by
Charles B. Frazier and Joseph B. Frazier,
Jr., who were two of the three-man executive committee of Sea Pines Company, the
parent.[1]   The subsidiary issued one hundred
shares of capital stock and later 10% of its
stock was transferred to Continental Mortgage Investors, and the remaining 90% of
the stock was ultimately assigned to Sea
Pines Company.

---

\* Honorable Robert G. Doumar, United States
District Judge for the Eastern District of Virginia, sitting by designation.

1. See R–1183; See R–683 through 702. They
became members of the board of directors of
Point South, Inc.

On February 19, 1973 AB & T issued to the subsidiary a loan commitment for $250,000 for a construction loan mortgage to enable Point South, Inc. to build a reception center on a parcel of the subsidiary's property, near the intersection of U.S. Highway 17 and Interstate 95 in South Carolina, to attract potential buyers to a planned development. The commitment itself was not assignable. The loan was closed on or about April 13, 1973, but the project was not funded at once as it was a construction loan. By September 4, 1973, approximately $133,000 of the $250,000 of the construction loan had been disbursed to Point South, Inc. There was no prohibition against assignability in the final note or mortgage, nor did the instrument call for an acceleration of the due date of the principal amount upon the sale of the property.

In August, 1973, Point South, Inc., the subsidiary, desired to sell the property to Point South Associates, a limited partnership, and lease it back. On August 29, 1973, Jeffrey Rhodes, then the assistant to the president of Sea Pines Company, wrote AB & T a letter on Sea Pines stationery which provided in pertinent part as follows:

> Pursuant to our phone conversation, enclosed please find the documents for the sale/leaseback of the Point South Reception Center.

> As we discussed Point South intends to sell the building and assign the mortgage to the purchasing entity. Point South Company and Sea Pines Company will guarantee the financing.

> We have preserved your first right of refusal to provide the permanent financing.

AB&T did not respond to Mr. Rhodes' letter. The rent payable by Point South, Inc., the subsidiary, to Point South Associates (a/k/a Point South Company), the limited partnership, was guaranteed by Sea Pines

Company, by a formal guarantee duly acted upon by the parent (R–742). However, no formal guarantee of the construction loan mortgage was ever issued to or requested by AB & T. The transaction was finalized on September 7, 1973.

In October, 1974, the subsidiary, Point South, Inc., and Sea Pines Company, acting through the common directors, mortgaged the equity of Point South, Inc. in a 76-acre tract as collateral for the loans of Sea Pines Company, the parent. The parent credited the debts which the subsidiary owed to the parent as alleged consideration for the subsidiary mortgaging its property and allowing the proceeds to go to the parent.

On May 30, 1975, the common directors of the corporations caused the sale and leaseback between Point South, Inc. and Point South Company to be canceled and Point South, Inc. repurchased the property. Point South, Inc. canceled the note and mortgage owed to it by Point South Associates, which was originally in the sum of $55,000. Sea Pines Company was released from its guarantee of rent payments on the reception center.

In February, 1973, Point South, Inc., the subsidiary, had a balance sheet showing properties or assets in excess of $2.5 million with a total net worth of $65,000, of which $1,000 was capital stock and $64,000 was retained earnings.[2] This highly leveraged subsidiary lost $242,000 between February, 1973 and February, 1974. In February, 1974, Point South, Inc. was insolvent, with a negative net worth of $177,000.[3] From February, 1974 until February, 1975, Point South, Inc., the subsidiary, continued to lose money so that by February, 1975, the total insolvency or negative net worth of Point South, Inc. was $1,949,000.00.[4]

The District Court concluded that Sea Pines Company did not guarantee the in-

---

**2.** The record indicates that the consolidated financial statements of February, 1973, after auditing, showed $65,000 net worth (R–475), although the balance sheet forwarded to AB & T unaudited indicated a net worth of $108,082 (R–752). Obviously, this audit reduced the figures.

**3.** R–480.

**4.** R–484.

debtedness of Point South, Inc. and refused to pierce the corporate veil of Point South, Inc. finding no fundamental unfairness. On appeal, FDIC contends that the District Court erred in finding that the letter, from Jeffrey Rhodes dated August 29, 1973, did not guarantee the "indebtedness" of Point South, Inc. to AB & T and that the actions of the common directors of Point South, Inc. and Sea Pines Company were not fundamentally unfair.

## I.

The initial contention of the plaintiff is that the letter of August 29, 1973 by Jeffrey Rhodes, constituted a valid guarantee by Sea Pines to AB & T for the construction loan mortgage on the reception center.

The parent maintains that there was no consideration for or acceptance of the guarantee by AB & T, that there was no showing that Jeffrey Rhodes had any authority to make such a guarantee, and finally, that there was no indication that what was written was in any way a guarantee. The parent maintains that the word "guarantee" in relation to Point South Company (Associates) and Sea Pines Company, refers to the sale and leaseback of the reception center. Additionally, the parent contends that the word "financing" was a reference to the agreement of the parent to guarantee the rent due by the subsidiary, under the lease of the reception center, to the purchaser, Point South Company (Associates), the limited partnership.

FDIC contends that the initial commitment prohibited assignment of the mortgage and that this letter was forwarded to AB & T to receive their consent to the assignment of the mortgage. This, they contend, enabled the purchaser, Point South Company, to continue to receive the funds or proceeds of the construction mortgage loan of which approximately 50% was still unfunded as of September 1, 1973. FDIC further argues that the word "guarantee" could not refer to the guarantee of the lease payments or financing inasmuch as Point South Company (Associates) would not be guaranteeing the lease payments or rent to itself.

The District Court found that the plaintiff failed to show: consideration for the alleged guarantee; and that there was an acceptance of the alleged guarantee by AB & T as required by South Carolina law. The District Court concluded that the plaintiff failed to meet its burden of proving the essential elements of the alleged guarantee.

For the reasons hereinafter set forth, it is unnecessary for us to decide whether the letter did or did not constitute a valid accepted guarantee.

## II.

The appellant argues that the District Court's finding that actions of Point South, Inc. did not fit into a pattern of fundamental unfairness or injustice is clearly erroneous, and, therefore, the corporate veil should be pierced. FDIC contends that Sea Pines Company dominated Point South, Inc. and used the subsidiary for its benefit and to the detriment of the creditors of Point South, Inc. The appellee, Sea Pines Company, contends that FDIC failed to firmly establish sufficient grounds for the Court to find that the subsidiary was the alter ego of the parent and to establish that there was an injustice committed or fundamental unfairness exhibited sufficient for the piercing of the corporate veil. They urge this Court to adopt a stringent view of injustice amounting to a fraud.

It would serve no useful purpose to reiterate the postulates set forth by this Court in the case of *De Witt Truck Brokers v. W. Ray Flemming Fruit Co.,* 540 F.2d 681 (4th Cir.1976), since the District Court found that a sufficient number of the factors to pierce the corporate veil were present except the existence of injustice or fundamental unfairness.

The District Court found as a fact, *inter alia,* the following:

(1) Point South, Inc. was a subsidiary corporation of Sea Pines Company. Sea Pines Company owns 90% of Point South, Inc.

(2) Point South, Inc. is a South Carolina corporation.

(3) Sea Pines Company is a Georgia corporation principally operating in South Carolina.

(4) Point South, Inc. and Sea Pines Company had common directors and officers.

(5) Point South, Inc. adhered to corporate formalities.

(6) Point South, Inc. was financed in large part by Sea Pines Company.

(7) Sea Pines Company paid the salaries and expenses of Point South, Inc. with the expectation that they would be reimbursed.

(8) Sea Pines Company caused the property owned by Point South, Inc. to be mortgaged for the benefit of Sea Pines Company.

(9) During the period in question, the executives and officers of Point South, Inc. did not act independently of those of Sea Pines Company.

(10) AB & T made a loan to Point South, Inc. for the construction of a reception center. Point South, Inc. sold the property to Point South Company, a limited partnership, and leased it back. The payments on the lease were guaranteed by Sea Pines Company.

(11) AB & T continued to advance money for the reception center to Point South, Inc. until 1974 when the advances were made directly to Point South Company for interest only.

The District Court refused, however, to hold the parent stockholder liable for the debts of Point South, Inc. to AB & T. The Court's rationale centered upon the knowledge that AB & T had or should have had concerning the control which the parent exerted over the subsidiary. The District Court found that AB&T knew or reasonably should have known of the stock ownership of the subsidiary, as well as the common board of directors. In addition, the Court held that the Bank should have known that the subsidiary was undercapitalized and essentially the alter ego of Sea Pines at the time it made the initial loan to Point South, Inc. The District Court concluded that there was no deceit or fraud by either Point South, Inc. or Sea Pines Company and, therefore, there was no fundamental unfairness or injustice.

We reverse the Court inasmuch as we find that the actions of Point South, Inc. and Sea Pines Company were fundamentally unfair to AB & T, a creditor of Point South, Inc. and predecessor in interest to the plaintiff/appellant, FDIC.

■ The District Court misconstrued this Court's decision in *DeWitt, supra.* In that case, this Court found fundamental unfairness as a predicate to piercing the corporate veil; however, fundamental unfairness did not necessarily require the existence of fraud and deceit. *Id.* Thus, in the absence of fraud and deceit, injustice or fundamental unfairness can exist, and where they so exist courts have reluctantly and cautiously pierced the corporation's protective veil. *DeWitt, supra.* See also *Anderson v. Abbott,* 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793 (1944); *Krivo Industrial Supply Co. v. National Distill. & Chemical Corp.,* 483 F.2d 1098 (5th Cir.1973); *Duplane Corp. v. Deering Milliken, Inc.,* 444 F.Supp. 648 (D.S.C. 1977).

In order to understand the basis for such, we must delineate the duties of directors. In *Koehler v. Black River Falls Iron Co.,* 67 U.S. (2 Black) 715, 720, 17 L.Ed. 339 (1862), the Court said that directors "hold a place of trust and by accepting the trust are obliged to execute it with fidelity, not for their own benefit, but for the common benefit of the stockholders of the corporation." Further, the Supreme Court has stated that "[t]he relation of the directors to corporations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously as are personal dealings between a director and his corporation . . ." and that those transactions must be shown to be fair in order to maintain the transaction. *Geddes v. Anaconda Copper Mining Co.,* 254 U.S. 590, 599, 41 S.Ct. 209, 212, 65 L.Ed. 425 (1921).

■ However, when the corporation becomes insolvent, the fiduciary duty of the

directors shifts from the stockholders to the creditors.

The law by the great weight of authority seems to be settled that when a corporation becomes insolvent, or in a failing condition, the officers and directors no longer represent the stockholders, but by the fact of insolvency, become trustees for the creditors, and that they cannot by transfer of its property or payment of cash, prefer themselves or other creditors .... *Davis v. Woolf,* 147 F.2d 629, 633 (4th Cir.1945). *See also Alexander, et al v. Hillman,* 296 U.S. 222, 56 S.Ct. 204, 80 L.Ed. 192 (1935).

In this case, the common directors had to have known by February, 1974, that Point South, Inc. was insolvent.[5] On October 6, 1974, while Point South was insolvent, its directors mortgaged the only unencumbered piece of property owned by the subsidiary (which was worth $350,000) for the debts of the parent. Sea Pines Company indicated that it credited the subsidiary's account $8,000 in consideration for the mortgage. In essence, the subsidiary mortgaged its property to secure and to pay for the loans of the parent. This was in no way beneficial to the subsidiary.

It is difficult to materially distinguish this incident from the decision of *Koehler v. Black River Falls Iron Co., supra.* There, the corporate officers placed a mortgage on the property of the corporation at a time when it was insolvent in order to secure the debts owed to themselves. The Court held as follows, *supra,* 67 U.S. (2 Black) at 720:

Instead of honestly endeavoring to effect a loan of money, advantageously, for the benefit of the corporation, these directors, in violation of their duty, and in betrayal of their trust, secured their own debts, to the injury of the stockholders and creditors. Directors cannot thus deal with the important interests entrusted to their management.

Here, the common directors were violating their duty by securing the debts of their only viable master, the parent, to the detriment of the creditor, plaintiff herein.

This is not the sole transaction with which we are concerned which was fundamentally unfair and unjust. In May, 1975, when Point South, Inc. was virtually $2 million in debt and insolvent, the board of directors of the subsidiary caused the sale and leaseback to be canceled. Point South, Inc. repurchased the property and canceled the $55,000 note due to the subsidiary by the partnership. This transaction also canceled the guarantee by the parent to the partnership of the subsidiary's rent.

At oral argument, counsel for Sea Pines Company was asked for whose benefit did the cancellation of the sale and leaseback and the repurchase of the property occur. Counsel admitted there was no benefit to the insolvent subsidiary but rather the cancellation and repurchase was for the sole benefit of the parent.

Each of these transactions clearly shows that the board of directors of the insolvent corporation was using that corporation and its assets for the benefit of the parent, Sea Pines Company, and not for the subsidiary. The parent, through the interlocking boards of directors, manipulated the assets, property and liabilities of the subsidiary. The directors violated the fiduciary duty owed to the creditors of the insolvent Point South, Inc. These two transactions clearly indicate fundamental unfairness and injustice.

The District Court had concluded that AB & T knew of the common directorships and should have known of the undercapitalization at the time it made the loan.[6] We feel that there was no evidence to indicate that AB & T knew or should have known that the directors would breach their fiduciary duties by stripping the subsidiary of its assets, when it became insolvent, for the

---

**5.** See discussion on finances, *supra.* The corporation was insolvent in February, 1974, and between February, 1974 and February, 1975, on an average, Point South, Inc. was losing in excess of $30,000 per week.

**6.** *But see* Footnote 2 where AB & T was led to believe that the subsidiary had a net worth of $108,082 at the time the loan was made.

benefit of the parent. It is these unjust and fundamentally unfair acts, not just the interlocking directorships and undercapitalization which causes us to set aside the corporate cloak. *DeWitt, supra; Cf., Bernardin, Inc. v. Midland Oil Corp.,* 520 F.2d 771 (7th Cir.1975) (absence of fraud and deceit where the parent unjustly stripped the insolvent subsidiary of its assets). We find that the acts of Point South, Inc. and Sea Pines Company mentioned herein were fundamentally unfair and the determination of the District Court to the contrary is REVERSED.

The decision of the District Court is REVERSED AND REMANDED in order that the District Court may enter judgment for the plaintiff against Sea Pines Company for the deficiency, interest and costs, and determine if the plaintiff is or should be entitled to attorney's fees.

REVERSED AND REMANDED.