699 F.2d 676
 12 Fed. R. Evid. Serv. 740
 Jacqueline B. CUNNINGHAM, Administratrix of the Estate of
John G. Cunningham, Jr., deceased; Fannie Estelle Spencer,
Administratrix of the Estate of James Earl Spencer,
deceased; John G. Cunningham, Administrator of the Estate
of Anthony Moses Cunningham, deceased; Mary Spencer,
Administratrix of the Estate of James Ray Spencer, deceased,
Appellants,
v.
RENDEZVOUS, INC.; Smith Marine Railway; The Humphreys
Railways, Incorporated; Jane G. Cox,
Administratrix of the Estate of William
Harvey Cox, deceased; William
House; James
Florant, Appellees.
 No. 81-1790.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 4, 1982.
Decided Jan. 27, 1983.
Rehearing Denied March 16, 1983.
 
 Ralph Rabinowitz, Norfolk, Va. (Rabinowitz, Rafal & Swartz, P.C., Norfolk, Va., on brief), for appellants.
 Peter W. Rowe, Norfolk, Va. (Stackhouse, Rowe & Smith, Norfolk, Va., on brief).
 John M. Ryan, Robert G. Winters, Norfolk, Va. (Charles Poston, Henry L. Sadler, III, Norfolk, Va., on brief), for appellees.
 Before BUTZNER, Circuit Judge, and HAYNSWORTH and FIELD, Senior Circuit Judges.
 FIELD, Senior Circuit Judge:
 
 
 1
 This action arises out of the sinking of the F/V RENDEZVOUS on December 10, 1978. The representatives of the families of four decedents whose deaths were occasioned by the accident filed complaints seeking damages for the alleged wrongful deaths of decedents against the corporation which owned the vessel, Rendezvous, Inc., on grounds of negligence and unseaworthiness; against two shipyards ("Smith" and "Humphreys") for alleged negligence in making repairs to the vessel prior to the sinking; and against the three directors of the corporation, Messrs. Cox, Florant, and House, for alleged negligence under the Death on the High Seas Act, 46 U.S.C. Secs. 761-768, and general maritime law. Decedents' representatives have appealed from a judgment rendered in their favor against the corporation, arguing that they have erroneously been deprived of certain theories of recovery against the other defendants. We affirm the judgment of the district court except as to the so called "corporate veil" issue, and remand the case for further proceedings on that question.
 
 
 2
 The four decedents were members of the crew of the F/V RENDEZVOUS, which vessel was captained by Florant and co-captained by House. The crew of the RENDEZVOUS was hired on at Englehard, North Carolina, after the vessel had had work performed on it by the Smith and Humphreys shipyards in Virginia. After several trips, the vessel made its final voyage from Chincoteague, Virginia, in December 1978, and carried on fishing operations in the Atlantic Ocean from December 7 until the night of December 9 or sometime the following morning. Early on the morning of December 10, 1978, a substantial amount of water was discovered in the engine room and an emergency pump was called for. The vessel began listing severely to the port, and shortly thereafter the hull in the area of the portside engine room porthole frame opened to the sea and water rushed in. At this point the pumps could not keep ahead of the inflow of water, the Coast Guard was radioed, and the crew abandoned ship, availing themselves of lifejackets and two life rafts. The RENDEZVOUS sank and the decedents drowned before the Coast Guard rescued the remaining members of the crew.
 
 
 3
 Except as to the defendant shipyards, the case was tried to a jury. At the close of testimony special interrogatories were submitted to the jury to determine who was the owner of the vessel and employer of the decedents, whether there was unseaworthiness or negligence, and, if so, what the recovery should be. The jury returned findings that the corporation was owner and employer, that the ship was not unseaworthy, and that the corporation was not negligent. The jury was reconvened by the trial court to render an advisory verdict setting damages based on the assumption that the ship was unseaworthy, and determined that recoverable damages totaled $215,000.
 
 
 4
 On the motion of decedents' representatives for judgment n.o.v., the trial court held that the vessel was unseaworthy as a matter of law and awarded damages against the corporation in the amount fixed by the jury. The district court refused to disturb the jury's finding that the corporation was owner of the vessel and the employer of the decedents. Upon its consideration of the evidence, the trial court ruled in favor of Smith and Humphreys on the cause of action against the two defendant shipyards.
 
 I.
 
 5
 Decedents' representatives urge as an initial ground of reversible error that the trial court improperly limited the testimony of their expert, Mr. Sayre, under Federal Rule of Evidence (F.R.E.) 703.[1] The disputed testimony concerns speculation as to the cause of the flooding of the engine room.
 
 
 6
 The precise cause of the flooding of the RENDEZVOUS was never determined at trial. Sayre offered several possible explanations as to the cause of the accident consistent with negligence on the part of both the shipyards and the corporation, but admitted that he was without firsthand knowledge of the vessel or the events on the morning of December 10 and that his hypotheses were simply "possibilities." Significantly, there was uncontroverted evidence that the other compartments which were separated from the engine room by watertight bulkheads were not taking on water at the time that the engine room was flooding, and that the water in the engine room was entering through the forward part of the compartment and moving aft. This evidence was flatly inconsistent with Sayre's hypotheses as to the cause of the sinking of the RENDEZVOUS, a fact which Sayre acknowledged upon questioning by the trial court.
 
 
 7
 To the extent that the trial court restricted Sayre's speculative testimony as to the cause of the accident to hypotheses consistent with the evidence before the jury,[2] the district court acted properly. Such limitation of expert opinion to material facts supported by or consistent with the evidence has long been the law in this Circuit, Kale v. Douthitt, 274 F.2d 476, 482 (4 Cir.1960); Gilbert v. Gulf Oil Corporation, 175 F.2d 705, 709 (4 Cir.1949), and remains a requirement under the liberal standard of F.R.E. 703, see 11 Moore's Federal Practice Sec. 703.10 (2d ed. 1982). Since the trial court's ruling on Sayre's testimony was consonant with the law of this Circuit and F.R.E. 703, we find no merit in the contention of decedents' representatives that the court's restrictive ruling warrants reversal.
 
 II.
 
 8
 Decedents' representatives also contend that the trial court's finding that the defendant shipyards were not negligent was erroneous. At trial, decedents' representatives introduced evidence showing that on one occasion at the Smith shipyard the RENDEZVOUS was hauled stern first out of the water and that the vessel rolled to one side during this procedure. The representatives also point to the fact that at the Humphreys shipyard two large fuel tanks were installed, and assert that the added weight and the manner in which the fuel tanks were fastened to the vessel contributed to the sinking. Decedents' representatives argue that the trial court improperly concluded that the defendant shipyards were absolved from liability since they did only the work requested by Cox, Florant, and House.
 
 
 9
 Although the court's ruling was to some extent predicated upon the fact that the Smith and Humphreys shipyards did only the work which they were directed to do, the more substantial leg supporting the court's ruling was its finding that there was no credible evidence that the work was performed negligently or in a non-workmanlike manner, the applicable standard in such maritime suits. See Fairmont Ship Corp. v. Chevron International Oil Co., Inc., 511 F.2d 1252 (2 Cir.1975); Alcoa Steamship Co. v. Charles Ferran Co., 383 F.2d 46 (5 Cir.1967). There was abundant evidence that no flooding problems were experienced subsequent to the repairs and prior to the accident. Furthermore, there was no evidence that the repairs or modifications in any way contributed to the ship's taking on water. There is therefore ample support for the court's finding. Because the court's ruling as to the absence of wrongful conduct on the part of Smith and Humphreys shipyards is not clearly erroneous, the trial court's ruling on this point may not be disturbed. Federal Rule of Civil Procedure 52(a); McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 7, 99 L.Ed. 20 (1954); Tucker v. Calmar Steamship Corp., 457 F.2d 440, 444-45 (4 Cir.1972).
 
 
 10
 We note further that to the extent the court's ruling was predicated upon the fact that the shipyards did only that work they were directed to do, the court's ruling was not erroneous. Decedents' representatives argue that a contractor or repairman is not justified in relying upon plans and specifications if they are so patently defective that an ordinary contractor or repairman would be put on notice that the work would be likely to cause injury, McClish v. Niagra Machine and Tool Works, 266 F.Supp. 987, 992 (S.D.Ind.1967), and that consequently the shipyards here should be found liable. In the present case, however, the repairs and modifications effected by the shipyards were never shown to have been improper or to have contributed to the flooding. Indeed, there was substantial testimony that after the repairs were completed by both shipyards the vessel handled well, the draft and freeboard were adequate, and the ship experienced no undue accumulation of water. Clearly, the repairs and modifications made by the shipyard at the direction of Cox, Florant, and House, if defective at all, were not so apparently defective as to warrant imposing liability for negligent repair.[3] Accordingly, the court's ruling absolving the Smith and Humphreys shipyards from liability is affirmed.III.
 
 
 11
 Decedents' representatives claim as a final ground of reversible error that the trial court incorrectly instructed the jury as to the requisite elements for piercing the corporate veil, and that therefore they were deprived of possible recoveries against one or more of the individual defendants as shareholders of the corporation.
 
 
 12
 Numerous facts were established at trial concerning the "corporate veil" issue. The charter for the corporation was issued on September 29, 1978, with Cox, House, and Florant listed as directors; the ship had been transferred to the corporation; and title and registration had been issued in the name of the corporation. Uncontradicted evidence established that the three individuals agreed to establish a corporation, and the relevant statute, N.C.Gen.Stat. Sec. 55-8, provides that the existence of the corporation begins immediately upon the filing of its Articles of Incorporation. However, the evidence also showed that Cox put up all the money for the corporation; that there were no corporate minutes, bylaws, corporate resolutions opening bank accounts, corporate notes or notices of corporate meetings, and that no stock was issued or received. Based on the testimony and evidence produced at trial, and the court's instruction that the jury must find fraud before the corporate veil may be pierced, the jury concluded that the ship was owned by the corporation, not the directors, either individually or jointly, and that the corporation was the sole employer of the decedents.
 
 
 13
 The primary paragraph of the jury charge with which decedents' representatives take issue is the following:
 
 
 14
 In order for you to find that the Rendez-vous, Incorporated, the corporation, was not the employer-owner in this case and, therefore, is not to be considered as separate from and independent of its stockholders, the burden is upon the plaintiffs to prove by a preponderance of the evidence that the corporation was so organized and operated as to be merely a sham or cover-up for the individuals involved and that it was used to cover fraud or wrongdoings towards these plaintiffs or their decedents. (Emphasis supplied.)
 
 
 15
 In another passage of the charge the court again instructed the jury that fraud or wrongdoing must be found before the corporate veil could be pierced.
 
 
 16
 The factors to be considered in piercing the corporate veil are set forth in DeWitt Truck Brokers, Inc. v. Flemming Fruit Company, 540 F.2d 681 (4 Cir.1976), and require little elaboration here. It is enough to note that in DeWitt we explicitly held that fraud is not a prerequisite to a finding to disregard the corporate entity. Id. at 684-85; Federal Deposit Insurance Corp. v. Sea Pines Co., 692 F.2d 973 (4th Cir., 1982). Rather, DeWitt stated the following standard for piercing the corporate veil:
 
 
 17
 The conclusion to disregard the corporate entity may not, however, rest on a single factor, whether undercapitalization, disregard of corporation's formalities, or what-not, but must involve a number of such factors; in addition, it must present an element of injustice or fundamental unfairness.
 
 
 18
 540 F.2d at 687 (emphasis supplied). Thus, it is clear under DeWitt that the corporate veil may be pierced in appropriate circumstances even in the absence of fraud or wrongdoing. See Sea Pines, supra, and cases cited therein.
 
 
 19
 By stressing to the jury that fraud must be proved before the corporate entity may be disregarded, the district court simply placed too heavy a burden upon the decedents' representatives in their attempt to obtain a judgment against the individual defendants. Decedents' representatives should be given a fair opportunity to demonstrate that the facts of this case meet the DeWitt standard, and, accordingly, the jury's finding that the corporation and not the individual defendants was the owner of the vessel and employer of the decedents must be vacated.
 
 
 20
 The district court's judgment is affirmed except as to the "corporate veil" issue. The finding that the corporation was the sole owner and employer is vacated and the case is remanded to the district court for further proceedings consistent with this opinion.
 
 
 21
 AFFIRMED IN PART, VACATED AND REMANDED IN PART.
 
 
 
 [1]
 F.R.E. 703 provides as follows:
 Bases of Opinion Testimony by Experts
 The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
 
 
 [2]
 Our review of the record reveals that Mr. Sayre was given great license in explaining his hypothesis and the bases on which they were grounded, despite the acknowledged inconsistency of his theories with the material evidence before the jury. On the facts, then, we perceive little basis in the argument that the limited restrictions placed on Mr. Sayre's testimony operated to the prejudice of decedents' representatives
 
 
 [3]
 The case decedents' representatives rely on in attempting to demonstrate that the shipyards should be held liable is clearly distinguishable from the case at bar. In Houston-New Orleans, Inc. v. Page Engineering Co., 353 F.Supp. 890, 898 (E.D.La.1972), an accident occurred with a dragline which had been repaired several days earlier. Evidence clearly demonstrated that the boom experienced severe operational difficulties while the transistors installed by the repairmen were in place, and that a visual inspection of the replacement transistors would have revealed that they were too small and of the wrong serial number. The F/V RENDEZVOUS did not demonstrate any operational difficulties after both shipyards had completed the repairwork, and indeed there were no apparent defects or operational problems with the vessel whatsoever