881 F.2d 1069
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Bob LEUPEN, Joyce Pamela Wangerin Leupen, his wife,
Plaintiffs-Appellees,
v.
KELLER INDUSTRIES, INC., 84 Lumber Company, d/b/a 84 Lumber
& Home Center, Defendants-Appellants.
 No. 88-2098.
 United States Court of Appeals, Fourth Circuit.
 Argued May 9, 1989.
Decided July 31, 1989.
Rehearing Denied Aug. 25, 1989.
 
 William Jacob Kobokovich, Jr. (Huber & Lutche on brief) for appellants.
 James Patrick Sullivan (Helen A. Dankos, Kidwell, Kent & Sullivan on brief) for appellees.
 Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and YOUNG, Senior District Judge for the District of Maryland, sitting by designation.
 PER CURIAM:
 
 
 1
 On July 20, 1984, Bob Leupen, a carpenter, was injured while using a six foot wooden ladder on a construction site. Witnesses described the ground upon which the ladder was placed as a flat, hard, gravelly surface. At the time of the accident, Leupen was standing on the ladder's third rung from the bottom, with his back to the ladder, hammering a two-by-four above his head, when the ladder collapsed. Both "spreader bars" of the ladder were found buckled after the accident, deformed "like horseshoes."[1] Leupen and his wife, Joyce Leupen, filed a diversity action in the United States District Court for the District of Maryland seeking compensatory and punitive damages from the ladder's manufacturer, Keller Industries, Inc., and seller, 84 Lumber Company d/b/a Lumber & Home Center. The Leupens alleged negligence, breach of implied and express warranties, and strict liability.
 
 
 2
 The action was tried before a jury (Smalkin, J., presiding). The district court granted a directed verdict as to claims based on breach of express warranty and breach of implied warranty of merchantability and/or fitness of use for a particular purpose, and as to punitive damages with respect to all counts. The district court also directed a verdict as to any theory of liability predicated on failure to warn of any defects, but refused to direct a verdict with respect to design defect claims of negligence, implied warranty of merchantability and strict liability.
 
 
 3
 The jury returned a verdict against both defendants as to the implied warranty of merchantability and strict liability counts, and against Keller Industries, only, on the negligence count. The jury awarded Bob Leupen $500,000 compensatory damages and Joyce Leupen $10,000 for loss of consortium.
 
 
 4
 The defendants have appealed, alleging that the district court improperly admitted into evidence the testimony of the Leupens' expert witnesses. Excluding such testimony, the defendants contend the evidence is insufficient to sustain the jury's verdict.
 
 A.
 
 5
 Essentially, the defendants charge that the district court erred by refusing to strike the testimony of the Leupens' expert witnesses. A brief review of the disputed expert testimony follows:
 
 
 6
 Dr. Robert B. Sleight, a psychologist, was offered by the Leupens as a human factors expert. Dr. Sleight testified that, in his opinion, Bob Leupen's conduct was a foreseeable and proper use of the ladder. Sleight also testified as to the product design process and the adequacy of the ladder's warning label.
 
 
 7
 Dr. Michael P. Gaus, an engineer, testified that the "spreader bars" of the ladder were subjected to compression because of uneven pressure on the feet of the ladder. Gaus theorized that one foot could have been set in a 1/2 inch depression or a pebble could have rolled out from under the ladder.
 
 
 8
 The Leupens' third expert, Dr. Jeffrey Bratspies, also an engineer, was offered as an expert in metallurgy. He testified as to the inadequacy of the materials used to construct the spreader bars and the size and geometry featured in the design. Bratspies also testified as to the possible causes of the spreader bars buckling and the ladder's collapse.
 
 
 9
 It is well accepted that expert testimony is permitted at trial if "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. An expert may base his opinion on facts or data "perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Fed.R.Evid. 703. The determination of what an expert is qualified to testify to and the admissibility of that testimony is within the sound discretion of the trial judge. Hamling v. United States, 418 U.S. 87, 108 (1974); Friendship Heights Assoc. v. Vlastimil Koubek, 785 F.2d 1154 (4th Cir.1986). See Garret v. Desa Industries, Inc., 705 F.2d 721, 724 (4th Cir.1983) (trial judge determination as to qualifications of expert witness reversible if clear abuse of discretion). Once an expert is given facts sufficient to form a reasonable foundation for his opinion it is up to the trier of facts to determine his credibility and the weight to be given his opinion. Kale v. Douthitt, 274 F.2d 476, 482 (4th Cir.1960); Spesco v. General Electric Co., 719 F.2d 233, 237-38 (7th Cir.1983).
 
 
 10
 In the case at bar, the district judge did not abuse his discretion by refusing to strike the testimony of the Leupens' three expert witnesses. There is no dispute as to the experts' qualifications. All testimony was based on permissible facts and was probative as to issues contained within the claims presented to the jury. While, as the district court noted, the theory of the defendants' expert--essentially finding that Leupen fell off the ladder and that the buckling of the spreader bars was caused subsequently by his falling body crashing into the ladder--appears at least as credible, such a determination is peculiarly within the province of the trier of fact. The threshold decisions admitting the various experts' testimony are well within the district court's discretion.
 
 1. Gaus
 
 11
 Defendants charge Gaus' opinion was based on pure speculation and was in direct contradiction to Bob Leupen's testimony. Specifically, they contend that Gaus' theory of a ladder foot resting in a 1/2 inch depression or on a pebble that subsequently rolled out contradicts Leupen's testimony that the surface was flat, level and hard, and Leupen's further testimony that he tapped the first step of the ladder when he set it up and it appeared stable.[2] Defendants further argue that Gaus' theory required Leupen to place all his weight on one side of the ladder, contrary to Leupen's testimony that at the time of the accident both of his feet were spread apart on the ladder's third step. Initially, it is clear that an expert's opinion must be limited to material facts supported by or consistent with the evidence. See Newman v. Hy-Way Heat Systems, Inc., 789 F.2d 269, 270 (4th Cir.1986); Cunningham v. Rendezvous, Inc., 699 F.2d 676, 678-79 (4th Cir.1983). We find that Gaus' opinion is fully consistent with the uncontroverted evidence in the record.
 
 
 12
 Although the surface was characterized by the witnesses as "level," it was also irregular. Various descriptions were given of the surface:
 
 Bob Leupen:
 
 13
 "It was a hard, gravelly surface. It was dry and hot, July."
 
 
 14
 "It was made out of cinders and gravel. It had been added to every spring, cleaning up and putting more gravel. It was a real hard compacted surface."
 
 Jack Leupen:
 
 15
 "It was an old pathway that was used to get to a public restroom and had been there for 20 years. It was hard as a rock. As a matter of fact, it had rocks on it, little pea gravel like stones, that it had been layer after layer put on over the years so that it would be a nice, neat place to walk to get to this bathroom."
 
 
 16
 Q: "So, when you describe it as flat, had there been any attempt to level it?"
 
 
 17
 A: "No, not prior to that. We did all of that afterwards, after we finished the siding and what have you. It was the original walkway that that ladder was sitting on at the time we put the door in."
 
 Randall Leupen:
 
 18
 "It was packed dirt with weeds and a few spots of grass." "There were spots of weeds and grass in the area."
 
 Ernest W. Seger:
 
 19
 "There had been a little gravel around it so there might have been a little gravel under it, but mostly it was sod."
 
 
 20
 "It was sitting pretty level."
 
 
 21
 Gaus explained the definitional problems with the generalized "level, hard" description:
 
 
 22
 Q: "Referring, if you will, please to the surface on which you were told the ladder was placed, does that in your opinion constitute a smooth, flat, level surface?"
 
 
 23
 A: "No, it does not."
 
 
 24
 Q. "And why not, sir?"
 
 
 25
 A: "Because it was described as being level, but a gravel surface, which means you could have stones and dirt, and I believe there was even some description that there was grass growing up through it, which indicates it could have been loose dirt in between the stones. So, it would not be a hard surface in the same sense as the ANSI test is a hard surface."[3]
 
 
 26
 Such subtle differences as to definition do not approach the sheer factual inconsistency held improper in Cunningham and Newman, supra, and consequently the admission of the testimony does not qualify as an abuse of discretion.
 
 
 27
 Leupen's testimony that he tapped the ladder and his general observation that it was stable do not alter the conclusion, as an initial appearance of stability is not inconsistent with Gaus' theory. Indeed, tapping the ladder into the ground, preventing the natural movement of the feet, conforms perfectly to the physical effects Gaus described. Also, Gaus' theory does not depend entirely on all Leupen's weight bearing on one side of the ladder, but instead, according to Gaus, the compression merely becomes greater as the load shifts to one side. There is no indication of the exact point at which the "critical mass" would have occurred and a collapse ensued.
 
 
 28
 Generally, there is sufficient ambiguity within the language employed by both witnesses and expert to avoid any glaring inconsistency with the evidence which would render it mandatory for the district court to strike Gaus' testimony. Defendants' further contentions concerning Gaus' testimony are specious and devoid of merit.
 
 2. Bratspies
 
 29
 Defendants charge that Bratspies' testimony was in direct contradiction to that of Gaus, that under normal circumstances Bratspies theorized the spreader bars would be under compression where Gaus found tension. Defendants also allege that Bratspies' point of view was contrary to basic engineering principles and common sense.
 
 
 30
 In response, the Leupens contend that Bratspies was called to testify as to an aspect of the causation problem different than that of Gaus, that is, the inadequacy of the component material and design of the spreader bars to stand up to the compressive forces exerted; and that Bratspies' testimony was not contradictory to Gaus', as it was in response to a different set of assumptions.
 
 
 31
 Bratspies' direct testimony was to the propriety and design of the spreader bars; his views on overall causation were elicited in cross-examination. While Bratspies' view of the basic physical forces operating on the ladder certainly differed in several major respects from that of Gaus, it was not germane to the subject matter of his direct testimony. Furthermore, the numerous factors and assumptions inherent in such scientific theorizing certainly obfuscate any clear violation of the laws of physics and may excuse some of the more blatant contradictions.
 
 
 32
 The fact remains, however, that such contradiction is immaterial to our decision, which must focus on the legal question presented. Bratspies was qualified, his testimony was based on the facts in evidence, and was material and relevant.[4] Other considerations are for the trier of facts.
 
 3. Sleight
 
 33
 Defendants object to Sleight's testimony, apparently on the grounds of irrelevancy. The defendants' argument does not make much logical sense, as a central thrust of Sleight's testimony concerned the design process, and the design claims were indeed all that was submitted to the jury. Though we express no estimate of the testimonial value of Sleight's "human factors" expertise and opinion, he was within the letter of the rule, was qualified, and his testimony was permissible.[5]
 
 B.
 
 34
 Defendants finally contend that the district court erred by refusing to grant their motions for directed verdict, new trial or JNOV. As we have found the Leupens' expert testimony admissible, the evidence contained in the record amply sustains the jury verdict. The experts testified as to a design defect in the aluminum spreader bars of the ladder which proximately caused Leupen's injuries, fully supporting the Leupens' theories of negligence, implied warranty of merchantability and strict liability. We agree with the district court's conclusions that the defendants' contentions in this regard were "plainly without merit."
 
 
 35
 Accordingly, the judgment of the district court is
 
 
 36
 AFFIRMED.
 
 
 
 [1]
 Considering the ladder as forming an "A" shape, the spreader bars are the horizontal members joining the two main sides. Although the ladder here was wooden, the spreader bars were aluminum
 
 
 [2]
 Much of the dispute as to Gaus' and Bratspies' testimony concerns a conflict between "tension" and "compression." According to Gaus, on a perfectly level surface, the feet of the ladder slide outward and the spreader bars are placed in tension, that is, having the physical property of being pulled at their end points by the forces placed on the rails and steps of the ladder. Under Gaus' theory, if one or more legs of the ladder are unable to move because of a surface condition (rut, depression, elevation, etc.), the spreader bars are subjected to the opposite force--compression. The forces exerted on the steps of the ladder transfer to the spreader bars and "push in" from the end points, causing the bars to buckle
 
 
 [3]
 The ANSI test used a level, smooth, vinyl surface
 
 
 [4]
 Indeed, both experts agreed that the cause of the accident was a failure of the spreader bars under a normal foreseeable use--they differed only as to the precise scientific rationale
 
 
 [5]
 Defendants' preoccupation with Sleight's testimony as to labelling, which they insist illustrates the testimony's relevance was limited to the eliminated express warranty claims, appears a red herring, as the Leupens' counsel adequately explained labelling's relevance as a component of the design process, fully relevant to the design defect claims