ROSENN, Circuit Judge,
concurring and dissenting:
I concur and join with the majority except with respect to the alter ego issue and the question relating to Blatstein’s transfer of stock to his wife, Lori. I do not reach this latter issue in light of my position on alter ego. As to the former issue, I believe that this record establishes that at all times Eric Blatstein[1] used the non-debtor corporations as his personal pawns. He manipulated them at will to hinder and avoid his personal creditors by unrestrict-edly drawing checks on each of them to meet personal expenses, purchases, and other obligations. He ignored the corporate form and the separate personalities of the corporations. I, therefore, respectfully dissent on the alter ego claims.
As president and chief executive officer, Blatstein controlled and dominated the corporations’ finances, policies, and business practices. Except for obtaining the articles of incorporation, only minimum corporate formalities were observed. Although the Blatsteins claimed they owned the corporate stock by the entireties, Lori Blatstein, his wife, did not know she owned any corporate stock, possessed no certificate, and she made no payment for any.
Extensive corporate loans were obtained and extended without corporate resolutions, either formal or informal, and there were no meetings of the board of directors or stockholders. When Blatstein deemed it desirable, the corporations engaged in fraudulent transfers, not only by Main, but with the participation of CFI and Colum-busco. The corporate form was ignored whenever it suited Blatstein’s convenience. Blatstein also fraudulently transferred his income derived from the corporations to Lori’s bank account. For these reasons and more, as I discuss infra, I believe the corporate veil as to all corporate defendants should be pierced to avoid manifest injustice.
I.
The doctrine that a corporation is a legal entity separate and apart from the shareholders composing it is a legal fiction designed to serve convenience and justice. It will be disregarded whenever justice or public policy demands. “[WJhenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate entity may properly be disregarded.” Ragan v. Tri-County Excavating, Inc., 62 F.3d 501, 508 (3d Cir.1995) (quoting Ashley v. Ashley, 482 Pa. 228, 393 A.2d 637, 641 (1978)).
Although courts will not lightly pierce a corporate veil, nevertheless in an appropriate case and in furtherance of the ends of justice, a corporation and the persons who own its stock and assets will be treated as identical. Cunningham v. Rendezvous, Inc., 699 F.2d 676, 680 (4th Cir.1983); Hanrahan v. Audubon Builders, Inc., 418 Pa.Super. 497, 614 A.2d 748, 753 (1992). The effect of such a decision in this case appropriately would sweep all of the assets of the non-debtor defendants into the Blat-stein estate, an objective sought by the trustees and the other plaintiffs, and one that is just. In United States v. Pisani, 646 F.2d 83, 88 (3d Cir.1981), we fashioned a federal rule and held that the corporate entity could be disregarded and the principal stockholder held liable to a creditor of *103 the corporation where relevant factors as set forth in DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681 (4th Cir.1976), showed that piercing the corporate veil was appropriate.
Factors to be considered in whether to pierce a corporate veil are gross underca-pitalization and
failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.
Pisani, 646 F.2d at 88 (quoting DeWitt Truck Brokers, 540 F.2d at 686-87).
In Pisani, this court also found relevant additional factors favoring piercing the corporate veil, such as operating the corporation with large sums loaned by the stockholder to the corporation and repayment with corporate funds while the corporation was failing, and keeping the corporation undercapitalized by lending it money instead of investing equity. Id.
As the majority observes, the bankruptcy court, relying heavily on testimony of defendants’ expert witness, Miller, declined to pierce the corporate veil. The bankruptcy judge relied on Miller, although he realized that Miller’s experience with debtors of questionable moral and legal standards “may have jaded his perceptions.” Main II, 213 B.R. at 82. He also thought that Miller was “occasionally over-aggressive in defending himself from what he claimed were distortions of the facts introduced by Plaintiffs’ counsel.” Id. at 77. Miller apparently impressed the bankruptcy court with his general thesis that in his experience, “he had observed all or most of the practices at issue and found them acceptable business practices.” Id. Two or more wrongs, however, do not make a right and, in some instances, Miller’s testimony has the ring of judge and jury, as well as expert.
As the majority observes, the bankruptcy court found no proof that the various corporations were in existence only to benefit Blatstein’s private concerns, or for illegitimate purposes. It also appeared to the court that all of the corporations other than Main were financially stable and successful businesses. As I discuss below, they were not. In addition, the court found that each corporation adhered to corporate formalities by keeping its own financial records and bank accounts, and by recording each loan granted to the Blatsteins. I disagree with the court’s conclusions, some of which are couched as findings, for reasons that follow, and I do not believe that keeping financial records by each corporation is sufficient to determine whether they adhered to corporate formalities in light of the evidence to the contrary.[2] The bankruptcy court ignored significant factors that justify piercing the corporate veil.
I believe an analysis of the alter ego issue must begin with an understanding of the role and character of the principal players in the activities of the corporations.
The architect in the formation of the non-debtor corporations is Eric Blatstein, now bankrupt and insolvent since 1980 when the IRS filed a lien against all of his property. His wife, Lori, collaborated with him, serving “as a faithful spouse, homemaker, and occasional business partner.” Main II, 213 B.R. at 77. Also playing an important role is Morris Lift, Blatstein’s accountant and financier Lift made loans to Blatstein or on Blatstein’s behalf to the corporations through various *104 unwritten arrangements. Actively participating in the “sham foreclosure” of Main and the fraudulent transfer of some of its assets to some of the non-debtor corporations, he assisted Blatstein in his persistent efforts to defeat the claims of his creditors. According to the bankruptcy court:
Prior to July 1996, Blatstein was the chief executive officer (“CEO”) and president of all of the corporate Defendants. He remains as president and CEO of all of the corporate defendants except Main, of which Lift became president as of July 1996 after “foreclosing” on the assets and stock of Main on July 25, 1996. Blatstein has final decision-making power and is the sole individual with check writing authority for all of the corporations in issue, including Main, the latter of which all of the defense witnesses agree Lift allowed him to continue to “run” after the “foreclosure” by Lift. The employees of all of these corporations act under Blatstein’s direction.
Id. at 74.
The bankruptcy court also found that Lift had been an “insider” of some of the debtors in the critical months prior to their filing; that Lift’s foreclosure on his note against Main of its assets was a sham transaction, and that “the transfer of most or all of Main’s assets to a series of other Blatstein-eontrolled entities within the year prior to the bankruptcy filings constituted ‘actual’ fraudulent conveyances which must be set aside.” Id. at 67. The collusive foreclosure sale was arranged to prevent Arch from executing on its judgment against Main’s assets. The court found Lift’s claims of innocence not credible, id. at 81, and found him to be “a willing accomplice to a fraudulent convey-anee.” Id. at 81-82. The court found the credibility of Lift and Blatstein highly questionable as to numerous issues throughout the trial. Id. at 97.
The bankruptcy court was convinced that at all times Blatstein had been “in control of the corporate defendants’ management and operations.” The court was also persuaded that when Blatstein testified that he directed Shoop, the controller for each of the corporations, to deposit all funds of Main after its bank accounts were garnished, and all of Main’s accounts receivable, into Reedco’s accounts and later into CFI’s accounts, this testimony constituted an admission “that his intentions were to hinder and/or delay Arch from executing on its judgment against Main.” Id. at 83. The court also rejected Miller’s attempts to trivialize this wrongdoing as a standard business practice. Id. The court found that the transfers orchestrated by Blatstein rendered Main “an insolvent, worthless shell,” and constituted an actual fraudulent conveyance of Main assets to Reedco, CFI, Lift and Columbusco within one year of Blatstein’s bankruptcy. Main II, 213 B.R. at 83.
I turn now to an analysis of the corporate ownership. Although the Blatsteins professed to hold the capital stock of each of the corporations by the entireties, this representation is suspect. Blatstein testified that his wife Lori did not pay for stock in the corporations and wrote no check in purchase of the stock. Lori also admitted that she did not know whether she owned stock in the corporations, and, after an effort to evade answering questions pertaining to her stock interest, testified that no stock certificate was ever issued to her. She also admitted that she never paid anything to purchase stock in the companies.[3] When confronted with his federal *105 tax returns prepared by Lift and returns filed with the Commonwealth of Pennsylvania, Blatstein admitted that each of them reported, under Blatstein’s oath, that he was the sole owner of the corporations.
The plaintiffs assert that Blatstein treated the corporations as a single entity. I agree. The Waterfront Management Corporation was organized for the purpose of managing all of the corporations and Shoop served as controller, as well as controller for each of the non-debtor corporations. Blatstein instructed Shoop that if one of his corporations lacked sufficient funds to pay its bills to use the funds of another corporation. For example, in 1996 the aggregate expenses paid by one corporation on behalf of another amounted to $554,749, a not insignificant sum. These frequent intercompany payments do not show “financially stable and successful businesses.” A corporation charged no interest on intercompany “loans” and there was no agreement as to when or how they were to be repaid. Id. at 92. The court found that these intercompany transactions were numerous; the court noted that Airbev paid $150,000 of Delawareco’s taxes. Engine 46 paid the start up costs for Airbev, and Main did the same for Reedco. Id. The companies also made frequent payments on Blatstein’s $500,000 personal tax liability to the Internal Revenue Service on his prior companies that failed. It is evident that the corporations were grossly undercapitalized; they each borrowed money from each other for start up costs and for capital.
The various corporations paid personal expenses of Blatstein, which were treated as loans. “No loan documents were ever executed,” id., and there were no documents to show when they would be repaid. The records were unclear to the court regarding how much money Blatstein owed Main on monies advanced in his behalf for payment of personal expenses, although one exhibit introduced at trial showed a sum in excess of $400,000. Id.
Essentially, Blatstein used his corporations as his personal bank. Whenever Blatstein paid his personal. obligations, whether expenses, real estate purchases, personal taxes or old debts, he drew checks on the corporations. He had no personal bank account. In August 1996, Columbusco paid $39,000 for his personal expenses. The 1995 tax return for Dela-wareco alone showed outstanding loans to shareholders of $283,570. In 1996, the corporation paid $269,117 for Blatstein’s personal expenses. The corporations made a large down payment for his Bucks County estate and afterward payments on the remaining debt, and wages for a horse trainer and stable hand. The bankruptcy court ■ summarized some of the evidence relating to Blatstein’s personal expenses as follows:
At trial, Shoop testified that numerous personal expenses of the Blatsteins were paid by the various corporations, including expenses for a horse trainer hired by the Blatsteins, loan payments to Lift for money loaned to the Blatsteins for the purchase of their home, and payments of Blatstein’s personal income tax debts owed to the Internal Revenue Service (“the IRS”). This testimony was confirmed by Blatstein and Lift during their trial testimony as well, and by numerous financial documents introduced into evidence.
Main II, 213 B.R. at 89. The bankruptcy court further found:
Loans from the corporate defendants to the Blatsteins include the $140,000 down payment that Pier 53 made on the Blat-stein residence, which was purchased in 1994. The monthly mortgage payments *106 on this loan are made by Delawareco and Main. In addition, Delawareco and Columbuseo made the payments on Blatstein’s personal federal income tax liability. The Beratans were being repaid with $1,000 per week payments from Main and its successor entities, e.g., Reedco, [Chicken Fingers], and Co-lumbusco.
Id. at 90.
In addition, Blatstein siphoned large sums of money as “loans” or “wages” from the corporations, notwithstanding their gross undercapitalization and their scurrying to borrow money from each other to stay afloat. For the year 1996, he drew $555,288 in gross wages from Waterfront Management Corporation. These funds were deposited in Lori’s bank accounts. His personal IRS return for 1995 showed gross wages of almost $500,000. These funds also went into his wife’s account, which this court now holds constituted fraudulent transfers.
Despite the bankruptcy court’s negative findings as to Blatstein’s credibility and his fraudulent activity to avoid paying creditors, the continuous and extensive payment of his personal obligations by the corporations and the nonobservance of the corporate forms or ordinary business practices, the bankruptcy court, largely persuaded by Miller, refused to pierce the corporate veil. Miller, the defendants’ expert, opined that there was nothing wrong with a corporation directly paying the expenses of a dominant shareholder. That depends, however, upon whether the payments are occasional, the amount, and the financial status of the dominant shareholder, whether he is a person of worth or insolvent and without assets, and whether the corporations are financially stable or severely undercapitalized.
The Pennsylvania Superior Court in Hanrahan v. Audubon Builders, Inc. held that where corporate funds were utilized, in the form of direct payments, as is the case here, from the corporations’ accounts for the shareholders’ personal expenses, including expenses at their home, for personal jewelry, personal mortgage payments, and their son’s private school tuition, piercing the corporate veil was appropriate. 614 A.2d at 753. The salient considerations here demonstrate that the personal expenses and other substantial personal obligations were paid and the large withdrawals permitted because Blatstein made the decision, he drew the checks, and corporate formalities were ignored.
I believe that Miller, who the judge acknowledged might have had “jaded perceptions” because of his prior experiences with debtors of dubious practices, misled the court. Miller applied his own personal “measuring stick” to reach for his conclusion that the corporate defendants were not Blatstein’s alter ego. Id. at 92. Miller and the bankruptcy judge compartmentalized Blatstein’s improprieties as isolated, discrete acts instead of viewing the totality of all the circumstances surrounding Blat-stein’s wide range of activities with the corporations. Miller attempted to minimize the number and amounts of Blat-stein’s personal expenses paid by offering his own formula. He took 1996 total gross revenues of the corporate defendants and divided it by Blatstein’s personal expenses to come up with 3.89% as representative of the total gross revenues paid for personal expenses. With this approach, he ignored the net earnings of the corporations, treated the corporations as a single entity for this purpose, and gave no consideration to Blatstein’s disregard of the corporate form and the separate personalities of the corporations and the individual. In DeWitt Truck Brokers, which we cited with approval in Pisani, the court noted that “[t]he conclusion to disregard the corporate entity may not, however, rest on a single factor.” 540 F.2d at 687.
Miller concluded that technically no fraudulent transfers in the form of company loans occurred because the transfers were from solvent corporations. They were barely solvent, however, only if the *107 loans to an insolvent Blatstein are considered in the calculation. Of greater relevance and importance than the solvency of the corporations, however, in determining whether the corporate veil should be pierced are the character, quantity, and frequency of the intercompany loans and the payment of Blatstein’s expenses, all made solely at Blatstein’s behest and accomplished in total disregard of ordinary corporate business practices. These corporations not only made loans to each other but they directly issued their checks to creditors in payment of another corporation’s bill and then booked the same as an inter-company loan. As the court noted in DeWitt Truck Brokers, “undercapitalization, coupled with disregard of corporate formalities, lack of participation on the part of the other stockholders, and the failure to pay dividends while paying substantial sums, whether by way of salary or otherwise, to the dominant stockholder ... has been regarded fairly uniformly to constitute a basis for an imposition of individual liability under the doctrine.” 540 F.2d at 687.
Miller’s opinion also addressed the legal factors reserved for courts under an alter ego analysis and exceeded the bounds of an accounting expert in his conclusion that piercing the corporate veil here was' not justified. Relying on Miller’s testimony, the bankruptcy court held that the plaintiffs failed to carry their burden. I disagree, for the record provides overwhelming evidence that Blatstein, as the president and sole stockholder of each corporation, the principal, if not the only stockholder, with sole cheek drawing power, ignored the corporate form, and treated the corporations as a single entity and his alter ego. A glaring example of Blat-stein’s disregard of the corporate entity is his agreement without appropriate corporate authorization with Transmedia Network, Inc. This is an organization which purchases food credit for its members and it pays the restaurant or night club fifty cents for every dollar of credit purchased. A provision of the agreément Blatstein entered into with Transmedia is that if one of the Blatstein restaurants closes, food credits can be used at all the other restaurants in which he has an interest. Thus, if the restaurant that was paid for the food credits received all the money and thereafter closed its doors or could not honor the credits, the other restaurants operated by the corporations would make good to Transmedia members. He had a similar arrangement with the Jefferson Bank under which checks written by one corporation which has not sufficient funds will be paid by one of the other companies that has sufficient funds available.
Blatstein, during the life of the corporations, has systematically schemed to avoid his creditors and has cleverly used the corporations and Lori’s bank accounts to thwart their efforts. He avoided his creditors by keeping no bank accounts or property in his name to answer for his debts, but paid expenses and whatever other obligations he chose to pay with corporate funds. All family bank deposits, including his income, were in his wife’s name. His personal purchases were made by one or more of the corporations, for he .had no personal accounts of his own, including the purchase of his Bucks County estate. The corporations paid his personal income taxes, including personal withholding taxes owing for prior failed corporations. The corporations made large “loans” to him, although they were undercapitalized and in financial straits. Blatstein even admitted that four of these corporations, Delaware-co, Reedco,' Engine 46, and Columbusco, continued to make payments to him or on his behalf after they had been garnished. This is probative evidence of fraudulent conduct and abuse of the corporate entity. See Northern Tankers (Cyprus) Ltd. v. Backstrom, 967 F.Supp. 1391, 1413 (D.Conn.1997).
Personal and corporate finances were intermingled. The bankruptcy court found that funds in the Gruntal account, of which *108 $480,000 was deposited on October 3, 1995, came from Delawareco and was “used to purchase items for the Blatsteins’ residence; to pay their mortgage; [and] to pay bills, predominantly tax liabilities, on behalf of the various corporate defendants." Main II, 213 B.R. at 94 (emphasis added). As the president and dominant stockholder of each corporation, time after time he disregarded the corporate structure of his companies for personal purposes.
In circumstances not as flagrant as we have here, this court in the past has pierced the corporate veil. There is such unity of interest, ownership and function between Blatstein and the non-debtor corporations that the separate personalities of the individual and the corporations no longer exist. This fusion of the corporate and individual personalities “may be satisfied by a showing of domination and control of the corporation, which occurs most often in the context of a parent-subsidiary relationship or of a closely held corporation.” Note, Piercing the Corporate Veil: The Alter Ego Doctrine Under Federal Common Law, 95 Harv. L.Rev. 853, 854-55 (1982) (emphasis added).
In Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1521 (3d Cir.1994), aff'd, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995), this court held that the corporate veil may be pierced when a corporation’s affairs and personnel were manipulated to such an extent that they became nothing more than a sham to disguise the alter ego’s use of their assets for his own benefit in fraud of creditors. The activities of the nondebtor corporations here show that they played a major role in meeting Blatstein’s personal needs in assisting him in his struggle to hinder and avoid his creditors. Proof of fraud, however, is not necessary to justify piercing the corporate veil, although fraudulent elements are present here. Under DeWitt, it is clear that “the corporate veil may be pierced in appropriate circumstances even in the absence of fraud or wrongdoing.” Cunningham, 699 F.2d at 680.
The bankruptcy court was also influenced in its decision by the clearly erroneous belief that the non-debtor corporations “are financially stable and successful businesses.” Main II, 213 B.R. at 91. If relevant, which I doubt, the evidence is to the contrary. Each corporation frequently paid bills for the other and checks shuttled back and forth in an effort to meet expenses and creditors, all of which reveals the fragile financial condition of the companies.
Despite the absence of any documents evidencing the “loans” to Blatstein, then-terms as to repayment, interest, or collateral, or any corporate authorization of the loans, formal or informal, the court concluded that corporate formalities were observed because each corporation had its own bank account and kept its own financial records. However, separate bank accounts and records for each corporation are not alone sufficient proof that corporate formalities were observed and the corporate entity respected, particularly when the bank accounts were each subject to Blatstein’s exclusive control and used for his personal purposes. The records kept by each corporation are ordinary business records without any distinctive corporate characteristics except that each corporation kept its own.
Shoop admitted that several weeks before his final deposition in this case, Lift told him to clean up his records, which resulted in the reduction of Blatstein’s loan balances “because my records were inaccurate.” Shoop also acknowledged that during his service as Controller from July 12, 1994 through 1996, he never issued a 1099 form to Lift showing the payment to him of interest on his loans to the corporations. He explained these annual lapses as an “oversight.” He also admitted issuing a check to Lift for $9,000 on September 18, 1996, at Lift’s direction which he could not explain. Although the foregoing illustrates that the corporate records were not *109 always accurate as to Blatstein and Lift, they do show that in 1996, the corporations paid for Blatstein’s personal expenses of $269,117.16 plus his wages for the year of $558,288. In undercapitalized corporations struggling to meet their current expenses, a withdrawal of $827,405 by Blatstein in one year constituted a “siphoning of funds of the corporation by the dominant stockholder.” Pisani, 646 F.2d at 88.
Although the majority acknowledges that “the Blatsteins did not run their corporations as strictly separate entities,” it concludes that they did uphold the corporate form sufficiently because the corporations kept separate records and bank accounts, and entered on the books all loans the corporations made to each other and to the shareholders. Maj. Op. at 101. I do not believe that under the law of this circuit, this one factor should defeat an equitable result and bar the piercing of the corporate veil in light of the many factors present that demonstrate the unity of interest and ownership of Blatstein and his corporations that commenced with the initial fraudulent transfers from Main to Reedco.
When one views the total picture, illuminated by the relevant factors set forth in DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., which were adopted by this court in United States v. Pisani, justification for piercing the corporate veil is clear. First, the corporations were grossly undercapitalized. Second, corporate formalities were never observed, and officers and directors were non-functional. Although the corporations kept separate bank accounts and separate records, this one factor is not determinative. Third, Blatstein, the dominant and, in my opinion, the sole stockholder, flagrantly siphoned funds from the corporations. He commingled personal and corporate funds. Fourth, Blatstein alone drew checks on the bank accounts of each of the corporations and corporation funds were used extensively for all of his personal obligations and expenses. Fifth, Blatstein used the corporations to hinder and delay creditors, including the fraudulent transfer of some of Main’s assets in the face of garnishment proceedings to Reedco and Columbusco, and the fraudulent transfer of funds siphoned from the corporations to his wife’s bank accounts. Finally, the total picture of Blatstein’s activities portray that his corporations were “a facade for the operations of the dominant stockholder.” Pisani, 646 F.2d at 88.
Accordingly, I respectfully dissent from the majority’s decision to affirm the district court’s order affirming the bankruptcy court’s determination not to pierce the corporate veil of Blatstein’s corporations.

. References in this dissent to "Blatstein” are to Eric Blatstein only.

. This court reviews the bankruptcy court’s legal conclusions de novo, factual findings for clear error, and exercises of discretion for abuse of discretion. See Interface Group-Nevada, Inc. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 145 F.3d 124, 130-31 (3d Cir.1998). This court has plenary review of the district court’s order. Id.

. Lori testified:
Q. That wasn’t my question. The question was, isn't it true you have never been given a stock certificate that has your name on it.
A. Yes.
Q. And you have not paid cash to purchase stock in any of the companies that your husband runs, is that correct?
A. Correct.
Q. And you don't think that you ever wrote a check to purchase stock in any of the *105 companies that your husband runs, is that correct?
A. Not that I can recall.
Q. As a matter of fact, you can't tell if you ever paid anything to purchase stock in any of the companies that your husband runs, is that right?
A. Not that I can recall.