393 A.2d 637

**Helen ASHLEY, Appellant,**

v.

**Joseph ASHLEY, Ashley Machine & Tool Co. and Wipco, Inc., Appellees.**

Supreme Court of Pennsylvania.

Argued Jan. 13, 1978.

Decided Oct. 5, 1978.

Reargument Denied Nov. 8, 1978.

Winkler, Danoff, Lubin & Toole, Sol Lubin, Peter B. Broida, Wilkes-Barre, for appellant.

Rosenn, Jenkins & Greenwald, Joseph J. Savitz, Wilkes-Barre, for appellees.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and LARSEN, JJ.

## OPINION

MANDERINO, Justice.

On October 8, 1971, appellant, Helen Ashley, commenced an action in equity in the Court of Common Pleas of Luzerne County, seeking to partition assets held as tenants by the entireties by her and her husband, appellee, Joseph Ashley, and to recover certain shares of stock in WIPCO, Inc. and in Ashley Machine and Tool Co. Following an extended hearing, the chancellor ordered an accounting and partition of all the entireties property held by Helen and Joseph Ashley. The Chancellor concluded, however, that appellant was not a shareholder of either WIPCO, Inc., or Ashley Machine and Tool Co. Exceptions filed by both appellant and appellee were denied by the court en banc. Appellee took no appeal from the court ordered accounting and partition of the property held by him and appellant as tenants by the entireties.

Appellant appealed that portion of the Court's decree denying her exceptions to the court's adjudication that she had no stock interest in WIPCO, Inc.; her exception to that portion of the adjudication denying her any stock interest in Ashley Machine and Tool Co. was withdrawn. The Superior Court affirmed the court en banc, *Ashley v. Ashley*, 240 Pa.Super. 702, 360 A.2d 233 (1976). We granted appellant's petition for allowance of appeal, and this appeal followed.

Appellant argues that she is entitled to 50 shares of WIPCO stock. She bases her argument upon the following facts about which there is no dispute. On January 6, 1964, appellant and her husband, appellee Joseph Ashley, entered into a subscription agreement with the newly formed WIPCO, Inc. The agreement, which was approved by the Board of Directors of WIPCO, Inc., stated that appellant and appellee were each to purchase 50 shares of WIPCO stock at a purchase price of $5,000.00 for each block of 50 shares. On March 5, 1964, individual stock certificates in the amount of 50 shares each to appellant and appellee, Joseph Ashley, were prepared by an attorney who handled appellee's legal

matters. The stock certificates were signed by the Secretary of WIPCO, Inc., Helen Ashley. Stock certificate "Number 1" purported to show that Joseph Ashley was the owner of 50 shares of WIPCO stock; certificate "Number 2" indicated that Helen Ashley owned 50 shares of WIPCO stock. The certificates were receipted for in WIPCO's stock certificate registry book, but they were not signed by the president of WIPCO as required by WIPCO's by-laws and by the Business Corporation Law, Act of May 5, 1933, P.L. 364 art. VI, § 607, as amended 15 P.S. § 1607(B). Appellant placed the certificates in a filing cabinet in the office of Ashley Machine and Tool Co., a corporation wholly owned by appellee, Joseph Ashley, and for whom appellant worked as office manager. Consideration for the subscription offer was provided by Ashley Machine and Tool Co., which transferred assets totalling $10,000.00 to WIPCO in March, 1964.

In May, 1972, subsequent to the commencement of the proceedings which culminated in this appeal, appellee authorized his accountant to mark "void and not issued" on the receipt stubs in WIPCO's stock registry book for the stock certificates indicating that Helen and Joseph Ashley each owned 50 shares of WIPCO stock. The receipt stubs were also crossed out with an "X." No notice was given to appellant that the shares certificate receipt stub indicating her ownership in 50 shares of WIPCO stock was being voided. At the same time that he "voided" the stock certificate receipt stubs above, appellee's accountant filled in WIPCO stock certificate "Number 3" to indicate that 100 shares of WIPCO stock were owned by Ashley Machine and Tool Co. Stock certificate "Number 3" was back-dated to March 11, 1964, pursuant to appellee's directions. In May, 1972, at the time of the above transactions, appellant was a judicially declared incompetent, having been declared so by the court on April 28, 1971, because of alcoholism. Her competency was judicially restored on June 5, 1972.

Appellant presents several theories in support of her contention that she is entitled to 50 shares of WIPCO stock. We agree with appellant that the chancellor erred in con-

cluding that appellee made no gift to appellant. Because the order of the Superior Court affirming the equity court's decree must be reversed on this ground, we need not discuss the other issues raised by appellant.

■ To establish a valid inter vivos gift, it is essential that the two elements of a gift be shown. These elements are (1) an intention to make an immediate gift, and (2) such actual or constructive delivery to the donee as will divest the donor of dominion and control of the subject matter of the gift. *Wagner v. Wagner*, 466 Pa. 532, 353 A.2d 819 (1976); *King Estate*, 387 Pa. 119, 126 A.2d 463 (1956).

"Donative intent is the intention to make an 'immediate gift.'" *Wagner v. Wagner, supra,* 466 Pa. at 537, 353 A.2d at 822, quoting from *Parkhurst Estate,* 402 Pa. 527, 531, 167 A.2d 476, 478 (1961). The evidence presented at trial clearly shows that at the time WIPCO was incorporated, appellee possessed the required "donative intent" to give 50 shares of the WIPCO stock to his wife, appellant here, and the equity court's conclusion that appellant had failed to establish that element of a valid, inter vivos gift was erroneous. At trial, appellee testified that, as early as January 6, 1964, he intended to give appellant 50 shares of WIPCO stock. He also testified that at the time WIPCO was incorporated in March, 1964, he intended to give appellant half of the WIPCO stock, and that his attorney prepared stock certificates Numbers One and Two, and put the federal tax stamps on them, in order to effectuate the intended gift. Appellee stated that at that time—March, 1964—he assumed that the stock had been issued. Subsequently, according to appellee, it appeared that the issuance had not been completed because the attorney was "having problems." For reasons not revealed at trial, certificates Numbers One and Two were never signed by the president of WIPCO. Additionally, the trial court found as a fact that from 1964 until 1968, at least, appellee made both oral and written representations that appellant owned WIPCO stock.

■ The second element that must be shown to establish a valid inter vivos gift is "delivery." *Wagner v. Wagner, supra.* Delivery of a share of stock may be effectuated by a physical delivery of the stock certificate, with or without written endorsement or assignment, *Connell's Estate,* 282 Pa. 555, 128 A. 503 (1925), and regardless of whether there has been an actual transfer of the stock on the books of the corporation (even when the corporation's by-laws make the certificates transferable only upon the books of the corporation.) 12 A. Fletcher, Private Corporations, § 5653 (rev. ed. 1957); 17 P.L.E. Gifts § 25 (1959). *See also Wagner v. Wagner,* 466 Pa. 532, 353 A.2d 819 (1976).

In *Connell's Estate, supra,* 282 Pa. 555, 128 A. 503 (1925), the Court held that a gift of stock had been made even though delivery of the certificates was made without endorsement as required by the Uniform Stock Transfer Act. The Court stated that the statute was enacted to protect the corporation so that it could safely pay dividends to the persons registered on its books as the owners of the stock. The Act was not intended to control the rights of parties transferring stock.

The Uniform Stock Transfer Act has been replaced by Article 8 of the Uniform Commercial Code. Section 8–307 states that

"[w]here a security in registered form has been delivered to a purchaser without a necessary indorsement he may become a bona fide purchaser only as of the time the endorsement is supplied, *but against the transferor the transfer is complete upon delivery* and the purchaser has a specifically enforceable right to have any necessary endorsement supplied." (Emphasis added.)

The reasoning of *Connell Estate,* and section 8–307 of the Code is implicit in *Brightbill v. Boeshore,* 385 Pa. 69, 122 A.2d 38 (1956). Prior to his death, the decedent in *Brightbill* assigned stocks to his daughter and delivered the certificates to her, making no changes on the books of the corporation. The certificates were placed in a safe deposit box to which both had equal access. The donor received and retained

dividends from his securities; he voted on the stock; his tax returns represented that he owned the stocks; finally he asked his daughter to put the stocks up for collateral. In spite of the fact that the donor continued to exercise certain rights incidental to the ownership of the stock, we found a valid inter vivos gift. Significantly, in *Brightbill,* the court did not discuss whether the transfer complied with the provisions of the Uniform Stock Transfer Act or the Uniform Commercial Code.

As we more recently said in *Wagner v. Wagner, supra,* 466 Pa. 532, 539, 353 A.2d 819, 822–23 (1976),

"[t]he essence of delivery of a gift is relinquishment by the donor of dominion and control of the subject matter of the gift. The clearest form of a delivery of a gift of corporate shares is registration of the shares in the name of the donee on the stock ledger of the company coupled with physical delivery to the donee of stock certificates in the name of the donee representing the shares so registered. *But less formal modes of delivery have also been held to be sufficient.*" (citations omitted) (emphasis added).

We believe that the instant case is analogous to the authorities cited above, and that the chancellor erred when he concluded that failure to comply with the formal requirements of the Business Corporations Law, Act of May 5, 1933, P.L. 364, as amended, 15 P.S. 1001 et seq., prevented appellant from establishing "delivery" so as to defeat the gift to appellant.

This conclusion is further supported by the language of the Business Corporation Law itself. Article VI, Section 607 (15 P.S. § 1607) outlines, among other things, the information required to be contained on the stock certificate. That section states that "[t]he shares of a corporation shall be *represented* by share certificates." (emphasis added). These certificates are required by the Act to state that the corporation is organized under the laws of Pennsylvania, and to state the name of the holder of the shares, the number of shares represented by the certificate, and the par value, if

any, of each share represented. If the corporation is authorized to issue shares of more than one class, the certificate is required to alert the shareholder of that fact and provision must be made to assure that the shareholder knows the relative rights of the shares of each class. The Act also provides that every certificate is to be signed by the president and secretary (or other authorized officers) and sealed with the corporate seal. Clearly, the purpose of § 607's requirements is to protect the purchaser of corporate stock, and to fully inform that purchaser of certain information deemed pertinent by the legislature. A corporation's failure to comply with Section 607's requirements was not intended to protect it in an action brought by a shareholder. In fact, Section 610 of Article VI (15 P.S. § 1610), states

"[t]he fact that shares are issued in violation of, or without full compliance with, the provisions of this act shall not make the shares so issued invalid."

Part of the reason for the trial court's failure to recognize what appears obvious to us—that appellee intended for appellant to share ownership of WIPCO—stems from the fact that the 100 shares of WIPCO stock were paid for by Ashley Machine and Tool Co., and not by appellee personally. As provided in the original subscription offer, which was accepted by the WIPCO Board of Directors, appellee and appellant were each to purchase 50 shares of WIPCO stock. Each block of 50 shares was to cost $5,000.00. Within one week of WIPCO's acceptance of this subscription offer, appellee caused Ashley Machine and Tool Co. to transfer various machinery and equipment to WIPCO. The record does not reveal the exact monetary worth of this machinery and equipment, however, the record shows that it was in excess of $10,000.00. In addition to authorizing this transfer of Ashley Machine assets to WIPCO, appellee, in conjunction with his accountant, set up the corporate records of both Ashley Machine and WIPCO to reflect that exactly $10,000 worth of these assets consisted of an outright transfer from Ashley Machine to WIPCO, while the remainder in excess of $10,000 value was carried as a loan from Ashley Machine to

WIPCO. (That loan has since been repaid by WIPCO). This $10,000 transfer from Ashley to WIPCO occurred approximately one week after acceptance by the WIPCO Board of Directors of the subscription offers of appellee and appellant to purchase 50 shares each of WIPCO stock for $5,000.00 each.

It is true that a corporation, such as Ashley Machine and Tool Co. is normally regarded as a legal entity separate and distinct from its shareholders (in this case appellee is the sole shareholder of Ashley), *Barium Steel Corp. v. Wiley*, 379 Pa. 38, 108 A.2d 336 (1954); *Monongahela Bridge Co. v. Pittsburgh & B. Traction Co.*, 196 Pa. 25, 46 A. 99 (1900). This legal fiction of a separate corporate entity was designed to serve convenience and justice, *Great Oak Building and Loan Assoc. v. Rosenheim*, 341 Pa. 132, 19 A.2d 95 (1941), and will be disregarded whenever justice or public policy demand and when the rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless. *Gagnon v. Speback*, 389 Pa. 17, 131 A.2d 619 (1957). We have said that whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate corporate identity may properly be disregarded. *Watercolor Group, Inc. v. Newbauer, Inc.*, 468 Pa. 103, 360 A.2d 200 (1976).

The record in the instant case clearly reveals that appellee himself disregarded the fiction that Ashley Machine and Tool Co. was an entity separate and distinct from himself. Not only did he personally authorize the transfer of $10,000 in Ashley assets to WIPCO in March, 1964, for the purpose of providing consideration for WIPCO stock, $5,000 of which was to be issued to him personally, but, as he testified at trial, he and Ashley Machine Tool Co. are "one and the same"; that "[he] was the business," and that the house in which appellee presently resides was purchased with Ashley Machine and Tool Co. funds. Significantly, when asked, how long he had lived in the house owned by Ashley Machine and Tool Co., appellee responded, *"I bought that home,*

we bought that home in 1970. . . . " There is no doubt that appellee commingled his personal interests with those of Ashley Machine and Tool Co. "In such circumstances the shareholder, in effect, pierces the corporate veil by intermingling his personal interests with the corporation's interests." *Watercolor Group, Inc. v. Newbauer, supra,* 468 Pa. at 117, 360 A.2d at 207.

The chancellor thus clearly erred in concluding that WIPCO's failure to fully comply with the provisions of the Business Corporation Law at the time its stock certificates Number 1 and Number 2 were purportedly issued invalidated the gift to appellant. Appellant and appellee, Joseph Ashley, had each offered to purchase 50 shares of WIPCO stock for a purchase price of $5,000.00 each. Those offers were accepted by WIPCO's Board of Directors, and consideration for the issuance of shares was provided by appellee who caused Ashley Machine and Tool Co. to transfer $10,000.00 worth of assets to WIPCO. At that point, the gift to appellant of 50 shares of WIPCO stock was complete, and WIPCO's subsequent failure to fully comply with the statutory formalities regarding the issuance of the certificates which represent those 50 shares, cannot invalidate the prior gift.

The order of the Superior Court, affirming the decree of the Court of Common Pleas, is reversed, and the matter is remanded for further proceedings consistent with this opinion. Each party to pay own costs.

POMEROY, J., filed a dissenting opinion.

EAGEN, C. J., dissents.

POMEROY, Justice, dissenting.

I respectfully dissent. I would affirm the chancellor's findings as approved by the lower court en banc.

The chancellor, after having seen all of the evidence and after having heard all of the witnesses, held that the evidence failed to establish either of the requisite elements of a valid inter vivos gift of stock in WIPCO, Inc. to appellant by

her husband, Joseph Ashley, or by Ashley Machine & Tool Co., a company totally owned by Joseph. The chancellor found that there was no delivery because appellant, who was secretary-treasurer of WIPCO, Inc., allowed the contested stock certificate to remain unsigned in the corporate files; that there was no showing of divestiture of control by the husband because it was not shown at trial who controlled the stock during the period from January 6, 1964, the date of purported issuance, to March 4, 1968, the date when the corporate records began to reflect sole ownership in Ashley; and that there was "no proof whatsoever" that it was Joseph Ashley's intention to make a gift of stock to appellant. (Appellant's brief, pp. 76–79).

We have said repeatedly that the findings of fact of a chancellor, affirmed by the court en banc, ordinarily "have the effect of a jury verdict and will not be reversed unless a review of the record reveals that they are unsupported by the evidence or predicated upon erroneous inferences and deductions or errors of law." *Payne v. Kassab*, 468 Pa. 226, 234, 361 A.2d 263, 267 (1976). In that decision we went on to observe:

> "The chancellor has seen and heard the witnesses; if a reading of the record reasonably can be said to yield the conclusions which he has drawn, we may not substitute our judgment for his. *Harrisburg School District v. Pennsylvania Interscholastic Athletic Association*, 453 Pa. 495, 309 A.2d 353 (1973); *Yuhas v. Schmidt*, 434 Pa. 447, 258 A.2d 616 (1969). See 9 Standard Pennsylvania Practice, Ch. 40, §§ 113, 115–117 (1962)." 468 Pa. at 234, 361 A.2d at 267.

My reading of the record in the case at bar leaves no doubt in my mind that the chancellor's findings were reasonably grounded in the evidence. The record is replete with inconsistencies and conflicts including, in the chancellor's words, the "morass of Joseph's oral statements, written statements, and badly kept corporate records." I believe that the chancellor could best resolve these matters.

Disregarding our salutary scope of review, the majority substitutes its judgment on disputed issues of fact for that of the lower court. This is jurisprudentially unsound, and I dissent.