578 A.2d 445

**Edward L. SOLOSKI, Appellee,**

v.

**William HETRICK, President, I.P. Shumaker, Inc., Dennis Reddinger, Majority Stockholder, I.P. Shumaker, Inc., and I.P. Shumaker, Inc., Appellants.**

Superior Court of Pennsylvania.

Argued May 2, 1990.

Filed July 19, 1990.

Jeffrey Gordon, Washington, D.C., for appellants.

Alberta Rae Beardsley, Kittanning, for appellee.

Before CIRILLO, President Judge, and POPOVICH and BROSKY, JJ.

POPOVICH, Judge:

This case involves an appeal from the order of the Court of Common Pleas of Armstrong County validating 500 shares of common stock issued to the plaintiff (Edward L. Soloski) by I.P. Shumaker, Inc., one of the three named defendants/appellants in the case at bar.[1]  We affirm.

The instant suit was commenced by the filing of an Action For Declaratory Judgment[2] by the plaintiff.  Therein, he alleged that the majority stockholder of I.P. Shumaker, Inc., Dennis Reddinger, directed him to issue 10,000 shares of the corporation's stock in the following manner: 9,000 to Reddinger, 500 to William Hetrick and 500 to the plaintiff.  All three stock certificates were signed by Hetrick and the plaintiff as president and secretary, respectively, of the corporation.  Thereafter, the plaintiff recounted how and when Reddinger exhibited interest in purchasing his stock, but, on reconsideration, concluded that the

---

1. The other party-defendants include William Hetrick, president of I.P. Shumaker, Inc. and Dennis Reddinger, majority stockholder of I.P. Shumaker, Inc.

2. See 42 Pa.C.S. § 7531 et seq.

plaintiff's minority interest rendered the stock worthless and not subject to being purchased.

After a shareholders' meeting, wherein the plaintiff demanded that I.P. Shumaker, Inc. be paid interest and royalties due it under an Asset Purchase Agreement (executed by some of Reddinger's other companies so as to justify the declaration of a dividend), the defendants disputed the plaintiff's shareholder status. A hearing was conducted to resolve the impasse.

The following information was adduced at the February 23 & 24, 1989, hearing; to-wit: The plaintiff was a certified public accountant under the employ of Reddinger,[3] the principal stockholder in the various family-owned businesses, some of which included Reddinger Coal Co., Terry Coal Sales, Inc., Terry R. Reddinger, Inc. and The Joy Co.—the first two dealt with mining, the third with trucking and the last had assets in real estate and personalty.[4]

One of the plaintiff's many duties included that of "controller" for Reddinger's enterprises. Also, he kept Reddinger abreast of "everything" so that he was privy to what had happened and what was going to occur in the business. The plaintiff also aided Reddinger in negotiations leading to new acquisitions. For example, the plaintiff assisted in the formation of I.P. Shumaker, Inc. This commenced early in 1980 when Reddinger learned that Ernest C. Dean Contractors, Inc. had filed for bankruptcy in the Western District of Pennsylvania. Reddinger, in the company of the plaintiff, attended the bankrupt's meetings in Pittsburgh and submitted a bid for Dean's coal reserves. During the "very complex" negotiations which culminated on August 20, 1980, with the purchase of the reserves for approximately

3. The plaintiff was paid a salary by Terry Coal Sales, Inc. and a fee from the remaining corporations.

4. In 1979, Kittanning–Freeport Coal Co. was acquired by Dennis and brought into the Reddinger fold. The plaintiff was assigned the responsibility of handling the new company's bookkeeping, and, to compensate him for the added work, he was paid an additional $23,000, boosting his salary to $80,000 a year at one point.

6.5 million dollars,[5] the plaintiff was the "spokesperson" along with Reddinger. Only after a tentative purchase agreement had been negotiated was an attorney for Reddinger called to scrutinize the closing agreements.

The Asset Purchase Agreement, between Terry Coal Sales, Inc., Reddinger Coal Co. and Kittanning–Freeport Co., collectively, and the bankruptcy trustee, contained provisions whereby royalty payments had to be made to I.P. Shumaker, Inc. This was to occur because Terry Coal Sales, Inc. and Reddinger Coal Co. were production companies and would be extracting the coal from the reserves. Consequently, they would have to pay monies to I.P. Shumaker, Inc., which acted as a holding company. The creditor required that such royalty payments be made to protect its interest (collateral in I.P. Shumaker, Inc). Additionally, the plaintiff and Reddinger were able to acquire $500,000 in working capital to start the business, and no cash-down payment was required in the purchase of the Dean coal reserves. As a result, on the drive back from Pittsburgh, according to the plaintiff, Reddinger stated:

> ... I really appreciate this and ... because of your efforts I want you to have five percent of the stock in I.P. Shumaker as a reward for your efforts.

This surprised the plaintiff. Then, Reddinger went on to say that he wanted 5% of the company to go to William Hetrick, his brother-in-law, "who ha[d] been [his] long time foreman and assistant. Without the two ..., [Reddinger didn't] believe the companies would be in existence today."

To effectuate Reddinger's intention, and at his direction, the plaintiff prepared three stock certificates listing Reddinger as owning 9,000 shares. Hetrick was assigned 500 shares and he allotted himself 500 shares. Also, at Red-

5. Terry Coal Sales, Inc. made the formal offer to the bank-creditor and the bankruptcy court. After the offer was accepted, the surface rights were deeded to Terry Coal Sales, Inc. (controlled 100% by Reddinger), while the mineral reserves were deeded to the about-to-be-formed I.P. Shumaker, Inc. This incorporation was to take place to appease the bank-creditor, who wanted a separate entity to whom it could look as a form of collateral.

dinger's insistence, the plaintiff signed the three certificates as "secretary" of the corporation. Hetrick appeared at the plaintiff's office thereafter and indicated he was there at Reddinger's urging to sign the same certificates as "president" of I.P. Shumaker, Inc.

Although I.P. Shumaker, Inc. was formed on August 27, 1980, so as to coincide with the signing of the Asset Purchase Agreement on August 28th of the same year, none of the documents was filed until sometime during the month of October and back-dated. In other words, no actual (organizational or shareholders) meeting was ever held. This, as testified to by the plaintiff, was the "normal" practice of the Reddinger corporations. The minutes for all the Reddinger companies were referred to as "canned", i.e., they would be prepared as time would permit ... sometimes 3 to 5 years later. The dates would be penciled in. The secretary would type them and update the information and present the minutes to the officers for signing. "This is ... or was the practice in all of the Reddinger companies", so stated the plaintiff. This was not disputed by Reddinger.

Once the plaintiff's tenure with Reddinger came to an end, he took his stock certificate with him. Thereafter, the plaintiff communicated with Reddinger that he wanted the annual financial statements of I.P. Shumaker, Inc. and notice of any shareholder meeting. Once the plaintiff was informed of the proposed shareholder meeting, he appeared and contended that various bookkeeping entries were in error since no royalties had been forthcoming to I.P. Shumaker, Inc. from the companies named in the Asset Purchase Agreement. Had such royalty payments been made, the plaintiff believed that dividends should/would have been declared to the stockholders.

Reddinger, upon his review of the corporate books, notified the plaintiff that the 500 shares of stock issued to him were invalid since they were not authorized over the signature of the president and secretary of I.P. Shumaker, Inc. as reflected in the organizational minutes and first meeting

of the board of directors. Accordingly, the plaintiff's request to have his shares purchased at a price of $500,000 was rejected since they were "worthless" as having been improperly issued and executed by officers not listed on the books of the corporation.

The court below, after taking testimony and finding there to be a conflict in the versions of what transpired, concluded that the evidence before it justified holding that the shares in the possession of the plaintiff were issued in accordance with the corporation's normal course of doing business. It discounted Reddinger's and Hetrick's account that neither ever directed the plaintiff to execute the certificate in question and entered a decree nisi legitimatizing plaintiff's 500 shares. After the submission of proposed conclusions of law and findings of fact, in addition to briefs in support of the parties' respective positions, the court entered an order making its decree final and ruling in favor of the plaintiff. The defendants below have perfected an appeal to this Court challenging the action of the court below. They do so in the form of two issues, the first of which is framed by the appellants thus:

I. Whether Plaintiff's representations to third parties that corporation was solely owned by Plaintiff's employer would estop Plaintiff from asserting shareholder status?

The defendants elaborate further in their brief to us at page 7 that the plaintiff made representations and issued financial statements to third parties, e.g., Timothy J. Cox, Vice–President of Commercial Lending, Union National Bank of Pittsburgh; Getty Oil Co.; Douglas Bell (Insurance Agency); and numerous potential investors of the Reddinger enterprises that Reddinger was 100% owner of I.P. Shumaker, Inc.

By these alleged "representations", the defendants contend, the plaintiff caused third parties to rely "on these statements to their detriment." Therefore, the defendants would have us hold that the plaintiff is precluded by the doctrine of equitable estoppel from denying his "representa-

tions" that Reddinger was 100% owner of I.P. Shumaker, Inc. We find this argument to be specious.

On the doctrine of equitable estoppel this Court had occasion to expound in *Thatcher's Drugs of West Goshen, Inc. v. Consolidated Supermarkets, Inc.*, 391 Pa.Super. 524, 571 A.2d 490 (1990). We wrote, in relevant part, that:

It must be remembered that the doctrine's objective is to prevent the perpetuation of an injustice upon one claiming its benefits.

\*   \*   \*   \*   \*   \*

... a party by whose encouragement expenditures have been made [or forbearance had] to such extent as are not capable of reimbursement except by enjoyment, will be enjoined from disturbing possession. Equity estops him because he would wrong the other party by withdrawing his consent[.] There is no higher morality than is contained in the equitable principle that where between two innocent parties a loss occurs, it is to be borne by him whose act occasioned it. The morality of the rule which throws the loss upon him who occasions it, is certainly much less questionable where it results from bad faith or fraud.

391 Pa.Super. at 534, 571 A.2d at 495 (Citations omitted).

Although no contractual privity has to exist between *parties* in order to bring into play the doctrine of equitable estoppel, *id.*, we cannot endorse the use of the doctrine by one who claims that "third parties had relied" to their detriment upon (mis)statements made by another, especially where such third parties are not even *parties* to the suit in which the doctrine has been invoked. *It is as if the defendants are attempting to secure the benefits of the doctrine "vicariously" through the purported wrong/detriment incurred by someone not a party to a suit brought for reasons other than to right the wrong/detriment attributed to the grievant against "third parties".* We will not and cannot extend the doctrine to such boundaries since it was not intended to give such relief.

■ The aggrieved parties, if such exist,[6] would be those made reference to by the defendants. As a consequence, it is not the defendant's place to assert a claim of injury/wrongdoing aimed at those *persona* who have not seen fit to act on their own behalf as intervenors in the suit. See Pa.R.Civ.P. 2327 & 2328. Suffice it to say, the doctrine of equitable estoppel is not a vehicle by which those seeking its benefits can do so via *others not even seeking its implementation.* The equitable principle comes into play where a loss occurs between two innocent *parties* to a suit. *Id.* As a result, the defendants' failure to cite any authority justifying the use of the doctrine of equitable estoppel in its case must result in the denial of equitable relief.

■ The last issue posed for our consideration is recited by the defendants thus:

II. Whether the Lower Court erred in upholding Plaintiff's claim of Stockholder status based on a stock certificate which was improperly executed and not purchased for value?

The defendants are of the belief that issuance of the 500 shares of stock to the plaintiff, over his signature as

6. Nowhere do the defendants state in specific terms how and when these "third parties" sustained a wrong that warrants vindication through and spills over to divest the plaintiff of shareholder status in I.P. Shumaker, Inc.

As to the financial statements issued by the plaintiff, he admitted at trial that he did so at the "direction" of Reddinger and never made any affirmations as to the truth and accuracy of the contents thereof.

As to whether the "statements"/letters sent by the plaintiff, at the behest of Reddinger, reflective of the financial and stockholder status of I.P. Shumaker, Inc. can be considered an "admission against interest", we leave it to the trial court to assign a value to such information, i.e., it could accept all, part or none of its contents as favorable to the defendants or against the plaintiff. Given the trier-of-fact's ultimate ruling, whatever value, if any, was attributed to the "statements"/letters, it was not sufficient to overcome the proof of Reddinger's authorization to the plaintiff to issue and execute the 500–share certificate and the subsequent acts of Reddinger evidencing an approbation of the plaintiff's status as a shareholder—invitation to shareholder meeting, being provided with a financial statement of corporation and meeting with the plaintiff to hear his proposed selling price of his shares to Reddinger. We see no reason to alter that decision.

secretary and William Hetrick as president, was void *ab initio* for non-compliance with Section 607(B) of the Business Corporation Law, 15 P.S. § 1607(B), and the by-laws of I.P. Shumaker, Inc., both of which require that stock certificates be signed by the president and secretary of the corporation.

Because the organizational minutes of I.P. Shumaker, Inc. list Reddinger as the president and Joseph Soloski (the plaintiff's son, who used to be employed by Reddinger) as secretary as of the time of the corporation's inception in August of 1980, it is the defendants' position that the plaintiff's stock certificate is invalid as not adhering to the "signature-requirements" of the by-laws of I.P. Shumaker, Inc. and Pennsylvania's Business Corporation Law. Further, even the corporation's registry did not list the plaintiff as owning or being issued any stock. And lastly, to buttress their argument of non-ownership, the defendants point to Pennsylvania's Uniform Commercial Code, 13 Pa.C.S. § 8205, which reads that:

An unauthorized signature placed on a security prior to or in the course of issuance is ineffective except that the signature is effective in favor of a purchase for value and without notice of the lack of authority.

The defendants assert that, because the plaintiff admitted that he was not the authorized secretary and Hetrick was not the president of the corporation at the time each signed the certificate at issue, the plaintiff "would not qualify as a purchaser for value *without notice* under the U.C.C. requirements." See Defendants' Appellate Brief at page 13 (Emphasis in original).

In finding the defendants' contentions flawed, we look to our Supreme Court's ruling in *Ashley v. Ashley*, 482 Pa. 228, 393 A.2d 637 (1978), wherein the wife-appellant was seeking, *inter alia*, to recover certain shares of stock in two corporations (# 1 and # 2). The Chancellor, after a hearing, found that the appellant was not a shareholder in either corporation. On appeal from the Superior Court's affirmance of the Chancellor's final decree, the Supreme

Court took exception to the determination of the Chancellor and reversed.

The *Ashley* Court found that the facts established that the husband-appellee had made a valid *inter-vivos* gift of the shares of stock in corporation # 1. In the course of making its decision, the Court recounted that stock certificates were prepared and signed by the secretary (appellant) of corporation # 1 whose stock was to be purchased by the appellant and the appellee. The certificates were receipted in corporation # 1's stock certificate registry book, but they were not signed by the president (appellee) of corporation # 1 as required by its by-laws and the Business Corporation Law, 15 P.S. § 1607(B). This was so even though consideration for the subscription offer was provided by corporation # 2 with the transfer of assets to corporation # 1. The certificates were placed in the offices of corporation # 2 by the appellant.

After suit had been instituted by the wife-appellant, the husband-appellee authorized the accountant to mark "void and not issued" on the receipt stubs of corporation # 1's stock registry book those stock certificates (# 1 and # 2) indicating that the appellant and appellee each owned 50 shares of corporation # 1's stock. At this same time, the appellee's accountant filled in a stock certificate # 3 to indicate that corporation # 2 owned 100 shares of corporation # 1 stock. This third certificate was back-dated pursuant to the appellee's direction.

In addition to the Supreme Court's conclusion that the husband-appellee's testimony evidenced the required "donative intent" to make a gift of the 50 shares of stock in corporation # 1 to his wife, the element of "delivery" of the stock had been established "regardless of whether there ha[d] been an actual transfer on the books of the corporation (even when the corporation's by-laws ma[d]e the certificates transferable only upon the books of the corporation)", and even though delivery of the certificates was made without endorsement as required by the then existing Uni-

form Stock Transfer Act. 482 Pa. at 234, 393 A.2d at 639 (Citations omitted).

It was the *Ashley* Court's finding that validation of stock certificates could be accomplished despite non-compliance with the rigors of by-laws or corporate statutes that elaborated on this issue. The Court's manner of its exposition is informative, viz.:

The Uniform Stock Transfer Act has been replaced by Article 8 of the Uniform Commercial Code. Section 8–307 states that

"[w]here a security in registered form has been delivered to a purchaser without a necessary endorsement he may become a bona fide purchaser only as of the time the endorsement is supplied, *but against the transferor the transfer is complete upon delivery* and the purchaser has a specifically enforceable right to have any necessary endorsement supplied." (Emphasis added.)

\*     \*     \*     \*     \*     \*

"... The clearest form of a delivery of a gift of corporate shares is registration of the shares in the name of the company coupled with physical delivery to the donee of stock certificates in the name of the donee representing the shares so registered. *But less formal modes of delivery have also been held to be sufficient.*" (citations omitted) (emphasis added.)

\*     \*     \*     \*     \*     \*

This conclusion [that the Chancellor erred when he determined that the formal requirements of the Business Corporation Law had not been complied with] is further supported by the language of the Business Corporation Law itself. Article VI, Section 607 (15 P.S. § 1607) outlines, among other things, the information required to be contained on the stock certificate. That section states that "[t]he shares of a corporation shall be *represented* by share certificates." (emphasis added). These certificates are required by the Act to state that the corporation

is organized under the laws of Pennsylvania, and to state the name of the holder of the shares, the number of shares represented by the certificate, and the par value, if any, of each share represented. If the corporation is authorized to issue shares of more than one class, the certificate is required to alert the shareholder of that fact and provision must be made to assure that the shareholder knows the relative rights of the shares of each class. The Act also provides that every certificate is to be signed by the president and secretary (or other authorized officers) and sealed with the corporate seal. Clearly, the purpose of § 607's requirements is to protect the purchaser of corporate stock, and to fully inform that purchaser of certain information deemed pertinent by the legislature. A corporation's failure to comply with Section 607's requirements was not intended to protect it in an action brought by a shareholder. In fact, Section 610 of Article VI (15 P.S. § 1610), states

> "[t]he fact that shares are issued in violation of, or without full compliance with, the provisions of this act shall not make the shares so issued invalid."

> \*     \*     \*     \*     \*     \*

> The chancellor thus clearly erred in concluding that [corporation # 1's] failure to fully comply with the provisions of the Business Corporation Law at the time its stock certificates Number 1 and Number 2 were purportedly issued invalidated the gift to appellant.

482 Pa. at 235–37, 393 A.2d at 639–40, 641 (Citation omitted).

At the outset, we note that shareholder status is particularly difficult to determine because of the lax method employed by Reddinger in administering I.P. Shumaker, Inc., which is consistent with the approach taken by the appellant with regard to his other corporate entities. For instance, it was not uncommon for Reddinger to back-date corporate minutes and not list in the corporate registry owners of corporate stock, the latter of which is exemplified not only by the case at bar but also with respect to the

Reddinger Coal Co. Also, it was "normal" practice for the Reddinger enterprises to dispense with organizational minutes and shareholder meetings. This fact is consistent with the plaintiff's account that, when the issuance of the stock certificates was to take place, they were back-dated to a period prior to the Asset Purchase Agreement on August 28, 1980. See Plaintiff's Exhibits Nos. 5–7. And, when this was to have transpired, Reddinger informed the plaintiff that:

> ... when you issue these certificates I don't want to be president. You have Bill [Hetrick] sign as president, you sign them as secretary....

Once Hetrick came to the plaintiff's office, at the insistence of Reddinger, to affix his signature on the stock certificates as president, the plaintiff recorded their issuance on the stubs of the stock certificate book by number, date, amount of shares and to whom they were issued. See Defendants' Exhibit No. 7. However, the plaintiff testified that he did not fill out the stock registry because "in the Reddinger operation it was so informal that the stock registry was not filled out in any of the corporations"; this included I.P. Shumaker, Inc. Further proof of this "informality" of record is evidence that for years 1980, 1981 and 1982, the plaintiff filed "U.S. Corporation Income Tax Return" (Form 1120) and signed each as "treasurer" of I.P. Shumaker, Inc. See Plaintiff's Exhibits Nos. 8–10. To the same effect see Plaintiff's Exhibits No. 2 (I.P. Shumaker, Inc.'s 1980 Registry Statement with the Commonwealth) and No. 11 (Pennsylvania Department of Revenue, Corporate Tax Reports, 1982).[7] This all occurred even though the plaintiff was not listed in the organizational minutes of I.P. Shumaker, Inc. as an officer of the corporation. See Plaintiff's Exhibits Nos. 3 & 4. Nor was Reddinger featured in the registry of Terry Coal Sales, Inc. as owning stock therein despite the fact that he was the sole stockholder. Yet Reddinger considered himself a shareholder of Terry

---

**7.** Once the plaintiff left Reddinger's employ on September 30, 1984, the forms just mentioned were filed by an independent accounting firm.

Coal Sales, Inc. In this same vein, Hetrick was never informed that he was an officer in Terry Coal Sales, Inc. (vice-president)—this appears on record at a special meeting of stockholders, paragraph 2. Also, Hetrick was unaware that he was a member of the board of directors of Redding-er Coal Co. See Trial Transcript at pages 229–230.

■■■■ From our scrutiny of the entire record, we hold that the corporation's failure to comply with Section 607 of the Business Corporation Law was not intended to insulate the entity in an action brought by a shareholder. See *Ashley*, supra. As for the claimed absence of "consideration" by the plaintiff for the 500 shares of I.P. Shumaker, Inc. stock, there is testimony by the plaintiff to the effect that:

> At the time the stock was issued, a single entry was made as a receivable from Dennis Reddinger, Bill Hetrick and Ed Soloski for ten thousand dollars on the one side and then the credit entry for stock issuance on the other side. Subsequently, Dennis['] nine[-]thousand dollars receivable was offset against his receivable-payable account that he had in the company wise [sic] with all of his companies. No cash on his part exchanged hand[s], but the validity of the receivable-payable entry was made and the thousand dollars, five hundred each for Bill and I was subsequently written off by way of [an] expense check.

On cross-examination, the plaintiff testified that I.P. Shumaker, Inc. had a credit issued to him, and he converted this to stock-purchase-value, i.e., the plaintiff never made a direct payment of cash, only an "indirect" cash payment. The credit was paid by Reddinger Coal Co. "through an intercompany entry." [8] See Trial Transcript at page 78.

---

**8.** The Chancellor's holding that payment for the 500 shares was accomplished through the plaintiff's efforts in closing the Dean coal reserves' deal does not alter our conclusion. Either remuneration is adequate to sustain the exchange of something for value for the shares in question. As an appellate court, we are permitted to affirm the actions of the court below for reasons (supported in the record) other than those proffered by the initial court hearing the matter.

■ This Court generally will not engage in an inquiry as to the adequacy of the exchange of shares for services rendered, and we decline to do so here. See *Krosnar v. Schmidt, Krosnar, McNaughton,* 282 Pa.Super. 526, 537, 423 A.2d 370, 375 (1980). The transfer being supported by proper consideration, the Chancellor's conclusion that the plaintiff became a shareholder is supported by the evidence. *Id.;* see note 8, supra. This also disposes of the defendants' argument that U.C.C. Section 8205's requirement that an unauthorized signature is effective where shares are *"purchased for value* and without notice of the lack of authority", the second prong of which is satisfied as well by the power given to plaintiff by Reddinger to act as secretary in the execution of the shares in question. This matter required a weighing of the credibility of differing versions of the conversation giving birth to the plaintiff's authority to act. Because, as is obvious, the Chancellor credited the plaintiff's statements, and since he was in a superior position to make that determination, we are bound by it. *Id.*

We affirm the decree of the Chancellor validating the 500 shares of the plaintiff in I.P. Shumaker, Inc.

Order affirmed.