**WHEELING–PITTSBURGH STEEL CORPORATION, Plaintiff,**

v.

**INTERSTEEL, INC., George Lipton and Richard Lipton, Defendants.**

Civ. A. No. 87–0199.

United States District Court, W.D. Pennsylvania.

Nov. 15, 1990.

Stanley Yorsz, Pittsburgh, Pa., for plaintiff.

Mark Ford, Steve J. Davis, Norcross, Ga., Bernard Marcus, Lori McMaster, Pittsburgh, Pa., for defendants.

## MEMORANDUM OPINION

LEE, District Judge.

This case is before the Court on a Motion for Partial Summary Judgment by defendants, Intersteel, Inc., (Intersteel), and George Lipton and Richard Lipton (Liptons) on the claim asserted by plaintiff, Wheeling–Pittsburgh Steel Corporation (Wheeling–Pittsburgh) that the defendants are the alter egos of Oxylance Corporation (Oxylance) or its division, Tower Pipe and Steel, Inc. (Tower). Cross–Motions for Summary Judgment on the alter ego issue were filed on the part of both plaintiff and the defendants on September 2, 1988. Following briefs and reply briefs in support of these motions, they were denied by the Honorable D. Brooks Smith by Order dated June 5, 1989. Defendants requested an opportunity to file a Motion with regard to choice of law on the alter ego issue and to file a Motion for partial summary judgment also on the alter ego issue. Such request was granted by Order of this Court on June 26, 1990.

Defendants filed their Motion for partial summary judgments on the alter ego issue and their Motion on the choice of law on July 26, 1990. Briefs in opposition to defendants' Motions were filed by the plaintiff on September 10, 1990.

### Facts

Wheeling–Pittsburgh was desirous of selling 9,500 tons of oil country tubular goods (OCTG) stored at its plant in Allenport, Pennsylvania (Allenport). Though it had many offers for the purchase of partial amounts at different prices per ton, Wheeling–Pittsburgh wanted to sell the entire 9,500 tons to one company at one price per ton, for continuous shipment from Allenport. The OCTG consisted of varying types of products of varying quality and

condition and of widely varying market value (from as little as $100 to more than $800 per ton). In late October 1985, Wheeling–Pittsburgh reached an agreement with Oxylance, a Georgia corporation owned by the Liptons, acting through its division of Tower Pipe and Steel, Inc.

Tower was to accept and pay Wheeling–Pittsburgh for the entire 9,500 tons of OCTG at a price of $307 per ton for each and every ton. Tower was to ship the product from Allenport continuously to complete the transaction by the end of the calendar year 1985 or, at the very latest within 90 to 100 days from the start of the shipments.

Wheeling–Pittsburgh alleges that Tower systematically removed from Allenport 6,000 tons of the OCTG having the greatest value.[1] Tower ceased performance leaving Wheeling–Pittsburgh with approximately 3,432 tons of OCTG consisting largely of products with the least value. Wheeling–Pittsburgh was ultimately able to resell this remaining product for only $90 per ton, $217 per ton less than Tower had agreed to pay. Several meetings in Pennsylvania were held to attempt to resolve the situation, but to no avail.

As a result of this dispute, Wheeling–Pittsburgh filed a lawsuit against Tower alleging breach of contract and seeking damages in excess of $1 million. (Civil Action No. 86–2098, filed in October of 1986 with this Court.) When Wheeling–Pittsburgh discovered that Tower was experiencing financial difficulty and was contemplating bankruptcy, plaintiff filed a separate but related suit against Oxylance Corporation, United States Tube, Inc., Intersteel, Tower, Richard Lipton and George Lipton, alleging that these corporations and persons all were alter egos of each other and, thus, were all liable for Tower's alleged debt to Wheeling–Pittsburgh. (Complaint was filed with this Court on January 16, 1987, initiating this action.)

In its Complaint Wheeling–Pittsburgh alleges breach of contract on the part of Tower, fraud on the part of Tower and its corporate officers, and further contends that Intersteel and the Liptons should be deemed the alter ego of Oxylance and held liable for its debts. Because the breach of contract and fraud causes of action are not a part of defendants' Motion for Summary Judgment, they will not be addressed.

The Liptons' liability is predicated on the alleged commingling of Oxylance's assets with that of their own. Wheeling–Pittsburgh alleges the Liptons flagrantly utilized corporate assets, sometimes under the guise of taking "salary advances," for various personal expenses. Wheeling–Pittsburgh further contends that Intersteel, though a theoretically separate corporation, failed to maintain a separate and distinct corporate existence from Oxylance. It is alleged that at the direction of the Lipton brothers, Intersteel substantially commingled its assets and affairs with those of Oxylance.

### Choice of Law

Jurisdiction of the Court in this action is based upon diversity and the Court is therefore required to apply the law of the forum state. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The Federal Court is required to apply the conflict of laws rules which would also be applied by the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Ordinarily, however, the Court does not consider the question of the choice of law in a diversity case unless a contention is raised that the law of the other jurisdiction, which may be applicable to the case, differs from the substantive law of the forum state. Before we begin an analysis of Pennsylvania's conflicts of laws rules, we must first look at the alter ego law of Pennsylvania and Georgia to determine whether there is an actual conflict.

---

**1.** This is known in the industry as "cherry picking" or to "cream the deal" by taking only the more valuable product and paying the low $307 per ton blended rate which was based upon taking all of the OCTG.

Under Pennsylvania law, the general standard for piercing the corporate veil is as follows:

"The legal fiction that a corporation is a legal entity separate and distinct from its shareholders was designed to serve convenience and justice, ... and will be disregarded whenever justice or public policy require and where rights of innocent parties are not prejudiced nor the theory of the corporate entity is rendered useless.... We have said that whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate identity may properly be disregarded." *Ashley v. Ashley*, 482 Pa. 228, 237, 393 A.2d 637, 641 (1978) as quoted in *Village at Camelback v. Carr*, 371 Pa.Super. 452, 538 A.2d 528, bill granted 519 Pa. 668, 548 A.2d 257 (1988).

In deciding whether to pierce the corporate veil, courts are basically concerned with determining if equity requires that the shareholders' traditional insulation from personal liability be disregarded and with ascertaining if the corporate form is a sham, constituting the facade for the operations of the dominant shareholder. *Carpenter's Health and Welfare Fund v. Ambrose*, 727 F.2d 279 (3d Cir.1983). Thus, the court must inquire whether corporate formalities have been observed and corporate records kept, whether officers and directors other than the dominant shareholder himself actually function, and whether the dominant shareholder has used the assets of the corporation as if they were his own. *Id.* at 284; *Ashley*, 482 Pa. at 237, 393 A.2d at 641.

It is clear that Pennsylvania will permit recovery on an alter ego theory by a showing of injustice once it is established that the dominant shareholder or the controlling corporation wholly ignored the separate status of a corporation and so dominated and controlled its affairs that its separate existence was a mere sham. See *In re: Penn Central Securities Litigation*, 335 F.Supp. 1026, 1035 (W.D.Pa.1971).

Similarly, to establish the alter ego doctrine in the State of Georgia, it must be shown that the stockholders' disregard of the corporate entity made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist; and to adhere to the doctrine of corporate entity would promote injustice and protect fraud. *Farmers Warehouse v. Collins*, 220 Ga. 141, 150, 137 S.E.2d 619 (1964), *Derbyshire v. United Builders Supplies*, 194 Ga.App. 840, 392 S.E.2d 37, (1990). The Courts of both of the above forums look to the amount of control that is exhibited over the corporation to determine whether the dominated corporation has lost its separate identity and was operating at the whim of the one controlling.

This Court finds that there is no conflict between the alter ego laws of the State of Georgia and that of Pennsylvania and, therefore, we need look no farther to determine that the law of the forum state, Pennsylvania, shall apply.

The defendants argue that the only logical approach to corporate disregard analysis must be that the law of the state of incorporation is the controlling law. To hold otherwise, they argue, would require a corporation to go beyond merely qualifying to do business in a foreign state and require instead that it incorporate in each and every state in which it conducts business. Defendants' reasoning is misguided. A corporation that wishes to do business in the State of Pennsylvania and avail itself of the laws of Pennsylvania is certainly aware that Pennsylvania has an acute interest in any corporation that intends to use the corporate entity to defraud or cause injustice to citizens or corporations within Pennsylvania. In the determination of whether one is acting as an alter ego of a corporation, the Court is weighing the conduct of the corporation and those behind the corporation. The Court is not looking at the technical requirements for the formation of a corporate entity. It is black letter law that incorporation is a shield to personal liability. One attempting

to use such shield must be aware of the conduct necessary to maintain its protection in every forum in which it plans to do business.

### Alter Ego Theory

Defendants have moved this Court to grant summary judgment in their favor pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.[2] In interpreting Rule 56(c), the United States Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) has ruled that:

> "The plain language ... mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322 to 323, 106 S.Ct. at 2552.

An issue of material fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Incorporated*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ The party wishing to prove that the corporate entity should be disregarded and liability imposed upon individuals has the burden of establishing by a preponderance of the evidence that the corporation was an artifice and a sham to execute illegitimate purposes and abuse of the corporate fiction and the immunity that it carries. *Zubik v. Zubik*, 384 F.2d 267 (3d Cir.1967), *cert. denied* 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291. The burden is therefore on Wheeling–Pittsburgh to show that the defendants participated in an alter ego situation warranting the piercing of the corporate veil.

In support of its contentions, Wheeling–Pittsburgh has listed a litany of transactions[3] evidencing the use of advanced accounts through Oxylance by the Liptons for both personal and business transactions. The advance accounts were accounts set up with Oxylance through which the company extended cash and credit advances to officers and employees, including the Liptons.

Wheeling–Pittsburgh emphasizes that the Liptons used the advance accounts for personal transactions. It is Wheeling–Pittsburgh's position that, as a result of the Liptons' widespread and systematic use of the corporation's assets to advance personal interests, and their persistent disregard of the distinction which theoretically existed between the personal assets and those of their corporation, the Liptons must be held liable for Oxylance's debt to the plaintiff. In *College Watercolor Group, Inc., v. William H. Newbauer, Incorporated*, 468 Pa. 103, 360 A.2d 200 (1976), the Pennsylvania Supreme Court noted that the corporate veil is properly pierced whenever one in control of a corporation uses that control of corporate assets to further one's own personal interests.

Wheeling–Pittsburgh maintains that the advance accounts evidenced commingling of the Liptons' assets and affairs with those of Oxylance to the extent that such control over Oxylance's assets furthered the Liptons' personal interests. The Liptons contend that the advance accounts evidence painstaking efforts to maintain the distinction between corporate and personal assets, rather than an attempt to blur the distinction. Any and all advances of cash or credit to the Liptons were scrutinized by employees of Oxylance's accounting de-

---

**2.** Fed.R.Civ.P. 56 in pertinent part reads as follows:
 "[Summary Judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

**3.** See Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment, pp. 3 through 16.

partment in order to determine whether the items charged were for personal or corporate purposes. The charges determined to be personal were credited to either of the Liptons' advance accounts, depending on who made the purchase. The advances would then be charged to the Liptons personally and thereafter would be repaid by them. The Liptons contend that the advance accounts were nothing less than a method by which they consciously, and through strict and proper accounting procedures, recognized and maintained the distinction between their personal assets and the assets of Oxylance.

 It is undisputed that the Liptons used the advance accounts for various personal uses. The question for this Court is whether such practices by the Liptons are sufficient to enable Wheeling–Pittsburgh to pierce the shield of the corporate entity. Pennsylvania courts will disregard the corporate entity if necessary to avoid injustice, however, piercing the corporate veil is the exception to the general rule. See *Village at Camelback v. Carr,* 371 Pa.Super. at 461, 538 A.2d at 533; *Reverse Vending Associates v. Tomra Systems U.S., Inc.,* 655 F.Supp. 1122 (E.D.Pa.1987); *Parker v. Dell Asbestos Mines, Limited,* 607 F.Supp. 1397 (D.C.Pa.1985). Relevant factors which the Court must address in determining applicability of alter ego doctrine are the failure to observe corporate formalities; non-payment of dividends; insolvency of debtor corporation; siphoning the funds from corporation by dominant shareholders; non-functioning of other officers and directors; absence of corporate records; whether the corporation is a mere facade for the operations of a common shareholder or shareholders; and gross under-capitalization. *Galgay v. Gangloff,* 677 F.Supp. 295 (M.D.Pa.1987). Wheeling–Pittsburgh has failed to set forth acts in the record that prove the existence of the above factors.

 It has been established by both deposition testimony and documentation produced by defendant that Oxylance, as well as all the corporations in this action, have (1) maintained separate corporate books and records; (2) maintained separate certificates of good standing; (3) maintained separate financial statements; (4) kept corporate minutes; (5) held Board of Director meetings; and (6) took corporate action through and pursuant to corporate resolutions.

 As noted above, in Pennsylvania, the corporate veil can be pierced "whenever it is necessary to avoid injustice," *Rinck v. Rinck,* 363 Pa.Super. 593, 597, 526 A.2d 1221, 1223 (1987), or, "... wherever equity requires that such be done either to prevent fraud, illegality or injustice or when recognition of the corporate entity would defeat public policy or shield someone from public liability for crime." *Village at Camelback v. Carr,* 371 Pa.Super. at 461–2, 538 A.2d at 533.

 In determining whether it would be an injustice for Wheeling–Pittsburgh, as creditor, to bear the loss as opposed to the corporate shareholders, a major consideration is whether Wheeling–Pittsburgh dealt voluntarily with the corporation or whether it was an involuntary creditor. Since the underlying cause of action from which this claim arose is a breach of contract, it is obvious that Wheeling–Pittsburgh was a voluntary creditor. It is not alleged that the defendants held themselves out as individuals, as opposed to a corporate entity, in their dealings with Wheeling–Pittsburgh. In fact, it has been admitted by Wheeling–Pittsburgh that it was at all times aware that Oxylance, Tower, U.S. Tube and Intersteel were corporations which were separate and distinct from one another. In his deposition, William J. Schaffer, Wheeling–Pittsburgh's manager in charge of OCTG, testified that Wheeling–Pittsburgh kept separate accounts and separate purchase orders for Tower, U.S. Tube, and Intersteel.

The evidence also establishes that prior to the entering into the purchase agreement at issue in this action, Wheeling–Pittsburgh was supplied with Oxylance's and Tower's 1984 audited financial statement. The audited financial statement which was provided specifically listed and explained the Liptons' advance accounts

with Oxylance. Therefore, when Wheeling–Pittsburgh entered into the voluntary business relationship with Oxylance's division, Tower, it was well aware of the existence of the advance accounts of which it now complains. If after reviewing the financial statements, Wheeling–Pittsburgh was concerned that the corporation it was dealing with lacked substance or was a mere "shell," as a voluntary creditor it could have insisted that the Liptons personally guarantee the performance of the corporation. Wheeling–Pittsburgh chose not to do this and in essence, chose to deal with the corporate entity.

■ Finally, Wheeling–Pittsburgh seeks to pierce Oxylance's corporate veil on the basis of acts and practices involving certain advance accounts, but have not shown the nexus between the use of those accounts by the Liptons and Wheeling–Pittsburgh's injury. It has been established that Wheeling–Pittsburgh knew of the advance accounts, and that the Liptons fully repaid the advance accounts. Under this scenario, it is inconceivable that the advance accounts could have in any way damaged Wheeling–Pittsburgh. Though there is evidence that $17,968.81 was miscoded as business expenses instead of personal advances, such amount could not have caused Oxylance to go bankrupt, impact the ability to perform obligations under the purchase order at issue, or impair its ability to pay plaintiff the amount it claims in this action.

■ The only evidence upon which Wheeling–Pittsburgh can base its alter ego claim is the existence of the advance accounts and the de minimis amount which was inadvertently miscoded as advances. This falls far short of that which is necessary for Wheeling–Pittsburgh to meet its burden. The injustice here would be to pierce the veil of corporate protection that was set up early in the investment based solely on the use of the advance accounts. Therefore, we find as a matter of law that a reasonable and fairminded jury would not find that the Liptons were the alter ego of Oxylance. Summary judgment on behalf of Richard and George Lipton shall be granted on the alter ego issue against the plaintiff, Wheeling–Pittsburgh.

Wheeling–Pittsburgh also alleges that Intersteel must also be deemed the alter ego of Oxylance and held liable for its debts. It is alleged that Intersteel failed to maintain a bona fide separate and distinct corporate existence from Oxylance and substantially commingled its assets and affairs with those of Oxylance. As evidence of the above, Wheeling–Pittsburgh contends that Intersteel and Oxylance paid each other's expenses, that Intersteel took advantage of Oxylance's corporate opportunities, utilized Oxylance's employees, and operated the vehicle for syphoning money out of Oxylance. Defendants contend that extensive measures were taken in order to keep all corporate affairs separate. Corporate procedures were set up so that any exchange of assets between or among the corporations at issue were treated as and documented as arm's length transactions between separate and corporate entities.

A review of the facts and the record leave this Court unable to determine as a matter of law whether Intersteel was acting as the alter ego of Oxylance. Therefore, Intersteel's motion for partial summary judgment on the alter ego issue shall be denied.