141 F.3d 1178
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
In re: PNP HOLDINGS CORPORATION, Debtor,
PAY 'N PAK STORES, INC., The Official Unsecured Creditors'
Committee of Pay 'N Pak Stores, Inc., ex. rel. Pay
'N Pak Stores, Inc., Plaintiffs-Appellants,
v.
COURT SQUARE CAPITAL LTD., fka Citicorp Capital Investors
Ltd,; Citicorp Venture Capital Ltd.; David J.
Heerensperger, and their marital community; Jill D.
Heerensperger, and their marital community; Marshall J.
Weigel; Jerry L. Marlow, and their marital community;
Jerry D. Horn, and their marital community; Kay Horn, and
their marital community; Sean Day; John Heilshorn;
Richard Takata, and their marital community; Wanda Takata,
and their marital community; Douglas G. Southern, and their
marital community; Jane Doe Southern, and their marital
community; Bryon Knief; Thomas Foley; PNP Investment
Partnership; Dechert, Price & Rhoades; National Union Fire
Insurance Company of Pittsburgh, an insurance corp.
organized under the laws of Pennsylvania with its principal
place of business in New York, Defendants-Appellees.
 No. 96-35835.
D.C. No. CV-93-01808-BJR.
 United States Court of Appeals,
Ninth Circuit.
 .
Argued and Submitted, Dec. 3, 1997.
Decided Mar. 18, 1998.
 
 Appeal from the United States District Court for the Western District of Washington Barbara J. Rothstein, Chief District Judge, Presiding.
 Before WRIGHT, REAVLEY** and KLEINFELD, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Citicorp, through separate entities named as defendants, purchased Pay 'N Pak in a leveraged buyout. Four and a half years later, Pay 'N Pak went bankrupt. After a few months in Chapter 11 status, it was liquidated. Unsecured creditors sued the Citicorp entities and others for their losses.
 
 
 3
 The basic theory of the lawsuit was that the leveraged buyout sucked so much capital out of the business that the business was bound to collapse, leaving the creditors holding the bag. Because the company became insolvent after it paid for its own acquisition, the directors' fiduciary duty ran to the creditors rather than the shareholders, and that duty was breached. The payments to the acquiring shareholders and their lenders were, according to plaintiffs, fraudulent conveyances. The way that the capital got sucked out was that after acquiring Pay 'N Pak, Citicorp used the Pay 'N Pak treasury, as is typical in a leveraged buyout, to pay back the money Citicorp had borrowed to buy the Pay 'N Pak stock. Citicorp had created holding companies that borrowed money, bought the outstanding shares, caused Pay 'N Pak to issue bonds after it was acquired, and caused Pay 'N Pak to use the bond proceeds to pay off the loans. Thus at the end of it all, Pay 'N Pak was out about $262 million for payments to the previous shareholders and to Citicorp for its expenses in buying the stock. In effect, Pay 'N Pak paid for its own acquisition, thereby looting its own treasury so that it could not weather bad times.
 
 
 4
 Citicorp's theory was that the buyout benefitted Pay 'N Pak, because Citicorp saved Pay 'N Pak from an unethical raider who was otherwise going to do the same thing, but would loot the treasury instead of carrying on the business. Citicorp preserved high quality management and carried on the business successfully for several years, which was well beyond how long it would have lasted had the leveraged buyout rendered the company insolvent as plaintiff claimed. The leveraged buyout did not make the company insolvent. The reason the company went bankrupt was that its business depended on residential construction, and an unanticipated severe decline in the homebuilding industry in the areas served by Pay 'N Pak stores, as well as intense competition from new entrants to the home improvement market (Eagle, Home Depot, etc.). Some of the creditors represented by plaintiff were large, sophisticated, trade creditors who continued to sell goods to Pay 'N Pak after the leveraged buyout and even after the bankruptcy. Some were buyers of the high interest, high risk bonds used to accomplish the leveraged buyout. Far from being victims, these creditors knew exactly what risks they were taking, for what purpose.
 
 
 5
 The case went to a jury trial, and the jury returned a verdict for Citicorp. In this appeal, the unsecured creditors' committee asks us to vacate the judgment. We decline to do so. The points raised on appeal are all claimed errors in jury instructions, though some are arguments that particular instructions were required or barred as a matter of law because the evidence allowed only for one conclusion. The headings in this disposition follow the headings in appellant's brief.
 
 A. Constructive Fraudulent Conveyance
 1. Instruction 10--Fair consideration
 
 6
 The creditors had to prove, under the district court's instruction, that "Pay 'N Pak did not receive something of fairly equivalent value in exchange for the transfer." The transfer referred to is the money used to pay off Citicorp's loans and expenses. The court instructed that the jury should consider not only money and property received, "but also all of the surrounding circumstances, including any non-monetary benefits received by Pay 'N Pak as a result of the transaction." The creditors argue that the district court should have instructed that as a matter of law, Pay 'N Pak did not receive fair consideration, instead of leaving the question to the jury. The creditors point out that Pay 'N Pak shoveled out a quarter of a billion dollars, and did not get a nickel's worth of property or money back. Citicorp got the company for next to nothing.
 
 
 7
 Citicorp argues that the jury would not have even reached this issue if it decided that Pay 'N Pak was solvent and sufficiently capitalized after the takeover, and only collapsed some years later because of a change in the business climate. It is entirely plausible that the jury agreed with that argument, because Pay 'N Pak did not collapse for several years after the money was paid out.
 
 
 8
 Though it seems probable from the evidence that the jury accepted that argument, the verdict does not establish it. The instructions allowed for the possibility that the jury found for Citicorp even though it decided Pay 'N Pak was insolvent when the leveraged buyout was completed, because it concluded that the consideration was fair. Citicorp's fair consideration theory was basically that Pay 'N Pak got for its money a better owner, preserved its management, and continued as a functioning business, instead of being broken up into pieces. The creditors conceded, at trial and in their briefs on appeal, that "non-monetary benefits may constitute fair consideration," including "an intangible type benefit, such as keeping management in." We therefore have no occasion to decide whether, as a general proposition, a leveraged buyout that quickly leads to bankruptcy subjects those who engineer the takeover liable to creditors. The case turns only on whether the evidence sufficed to establish a jury question.
 
 
 9
 Much of Citicorp's evidence was an attack on Paul Bilzerian. Pay 'N Pak used Citicorp as a "white knight" to avert a Bilzerian takeover. Citicorp put on evidence that Bilzerian was a "raider," and that "raiders c[a]me in and ripped up a company, laid a lot of people off, stopped your expansion and didn't really care about the people." The jury might plausibly have rejected Citicorp's defense, and concluded that Citicorp was no better than Bilzerian would have been. After all, the employees were left jobless and the creditors unpaid despite the "white knight" takeover--what was supposed to happen if the bogeyman of the case, Bilzerian, took over, did happen after Citicorp took over, perhaps a little later. Perhaps Pay 'N Pak would have weathered the storm of the subsequent cyclic industry decline had its treasury not been drained to pay for Citicorp's leveraged buyout.
 
 
 10
 But Citicorp presented evidence that, after the leveraged buyout, Pay 'N Pak was solvent, kept the same management, employees, expansion and sales programs that it had in place before the buyout, and that it started down the steep hill to failure about three years later only because of increased competition and a recession in the home building industry. The evidence allowed for the conclusion that the company would have fallen apart immediately had Bilzerian bought it, and would have survived and thrived after Citicorp's buyout, but for an unforeseen recession and increase in competition. Powerful evidence supporting Citicorp's theory was that trade creditors were paid in full for the first three years after the buyout. Because a reasonable jury could go either way on the question of "consideration of fairly equivalent value," the district court did not err in giving the instruction and leaving resolution to the jury.
 
 2. Instruction 11--Insolvency
 
 11
 Appellant's arguments regarding Instruction 11 are not that the instruction was erroneous, but that the judge should have instructed differently and more extensively. Because the formulation of jury instructions is a matter of discretion, Glover v. BIC Corp., 6 F.3d 1318, 1327 (9th Cir.1993), and the district court's exercise of discretion was reasonable, these arguments are not a basis for setting aside the verdict. Much of what appellant sought in the instruction was permissible but not necessary.
 
 3. Instruction 12--Under Capitalization
 
 12
 We reject appellees' arguments that objections to instruction 12 and others were waived--in the circumstances they were clearly preserved. Nevertheless, appellant's attacks on Instruction 12, and our response, are the same as with respect to Instruction 11.
 
 4. Instruction 13--Inability To Pay Debts
 
 13
 Appellant's attack on Instruction 13, and our response, are the same as with respect to Instructions 11 and 12. Indeed, the court's formulation of the instruction was more consistent with then controlling (subsequently repealed) Wash. Rev.Code § 19.40.060 than appellant's proposed instruction.
 
 B. Washington Fraudulent Conveyance Act
 
 14
 Appellant argues that Instruction 7 misstated the law under the now repealed Washington Fraudulent Conveyance Act, Wash. Rev.Code § 19.40.070, because it failed to explain to the jury that intent to defraud, intent to hinder, and intent to delay were alternative grounds for liability. The argument is incorrect. The instruction given said "hinder, delay or defraud." Appellant wanted additional language, that "you do not need to find an intent to hinder, delay and defraud." The word "or" sufficed--in the English language, "A, B or C" ordinarily means A or B or C.
 
 C. Fiduciary Duty
 1. Duty of Loyalty
 
 15
 Appellant argues that the district court should have instructed the jury that the corporate directors had a duty of loyalty. But it did. The judge correctly instructed in Instruction 16 that under Washington law, a director had to act "in good faith" and "in the best interests of the corporation." Appellant suggested additional language, that a "director owes undivided loyalty to the corporation," and that "[a]ctions taken for the personal advantage of the director breach the director's duty to act in the best interests of the corporation." The instruction the court gave adequately opened the door to the argument that the directors breached their duties of loyalty, and the difference between the proposed language and the language used was within the court's discretion in the formulation of instructions. Glover v. BIC Corp., 6 F.3d 1318, 1327 (9th Cir.1993).
 
 
 16
 As for appellant's arguments that the court should have instructed that the duty of loyalty was breached by operating the business at a loss, and by firing Chief Executive Officer Heerensperger, that was properly left for counsel to argue and for the jury to decide. The court was within its discretion in refusing to permit amendment of the complaint based upon the evidence that came out at trial about Heerensperger's dismissal, because it came too late to afford a fair opportunity to respond. Martinez v. Newport Beach City, 125 F.3d 777, 785 (9th Cir.1997).
 
 2. Knowledge of Insolvency
 
 17
 The court instructed the jury that, in order to show breach of a fiduciary duty to the corporation's creditors (as opposed to the corporation), appellants had to prove that "the directors knew or should have known that Pay 'N Pak was insolvent at the time of the alleged breach" (emphasis added). Appellant had offered an instruction that the directors' duties extended to creditors "[w]hen a company is insolvent" (emphasis added). We have found no Washington law in point, on whether the fiduciary duty shifts to creditors when insolvency occurs regardless of whether the directors know it has, or only when the directors ought to have known that insolvency has occurred. Cases elsewhere have not focused on this, though the language may suggest one conclusion or the other. See Federal Deposit Ins. Corp. v. Sea Pines Co., 692 F.2d 973, 976-977 (4th Cir.1982); Clarkson Co. v. Shaheen, 660 F.2d 506, 512 (2d Cir.1981). Directors must at all times have a fiduciary duty to someone, so a shift from shareholders to creditors without their knowledge need not be unfair. On the other hand, the difference in how they protect creditors as opposed to shareholders may require the directors to know to whom their duty runs.
 
 
 18
 We need not resolve the issue in this case. If the instruction was erroneous, which we do not decide, the error was harmless. As a practical matter, the standards could lead to different results only in one circumstance: The company was insolvent, but even the most careful directors exercising their stringent fiduciary duty of care would not have found out that the company was insolvent. That might happen, hypothetically if a company suffered a huge embezzlement well hidden from its officers and directors. But nothing like that happened in this case. The Pay 'N Pak directors knew how much money they spent to pay for the leveraged buyout, how much was left, and how much revenues and expenses ran. If Pay 'N Pak became insolvent, it was not hidden from its directors. Thus we need not decide whether the duty shifts upon an insolvency unknown to the directors that could not have been discovered in the exercise of their fiduciary duty.
 
 
 19
 3. Duty to mitigate.
 
 
 20
 The district court instructed the jury that appellants were "obliged to take reasonable steps to mitigate, or reduce, the damages once their cause is or should have been discovered." Appellants argue that the court should not have instructed on mitigation at all, because failure to mitigate was not pleaded, there was no evidence for it, and there could have been no such failure in the circumstances. We need not decide whether the instruction should have been given, however, because it made no difference. The jury returned a special verdict finding no fraudulent conveyance and no breach of duty, so it did not reach the question of damages. See Naylor v. St. Louis Southwestern Ry. Co., 847 F.2d 1305, 1307 (8th Cir.1988). Because the jury never got to damages, it did not use the damages instructions, and if a damages instruction was incorrect, it did not matter.
 
 D. Statute of Limitations
 1. Discovery Rule
 
 21
 Three of the four claimed fraudulent conveyances occurred more than three years before the bankruptcy filing, so appellant concedes that it needed some tolling to avoid the bar of the statute of limitations on those claims. The district court instructed that the statute was tolled "if plaintiff was unable, after the exercise of due diligence, to discover the facts that would have shown" appellant that the transactions at issue were fraudulent conveyances.
 
 
 22
 a. "Publicly Known"
 
 
 23
 Appellant argues that the court erred by instructing the jury that "[a] person is deemed to know those facts that are publicly known or in the public record ...." Its objection is that the phrase "publicly known" expands the knowledge the creditor is charged with beyond the public record, to anything that is in any newspaper or other media report.
 
 
 24
 Washington law is not clearly established on the point, but suggests that a creditor must be charged with facts that a creditor could have discovered with reasonable diligence, whether in some official record or not. Strong v. Clark, 56 Wash.2d 230, 352 P.2d 183, 184 (Wash.1960), says "[a]ctual knowledge ... will be inferred if the aggrieved party, by the exercise of due diligence, could have discovered it." Most of the cases applying Strong do so in the context of public records, but they do not hold that Strong is limited to public records. Tolling is a way to protect the reasonably diligent from their innocent lapses. Whether a reasonably diligent person should have found out something does not necessarily turn on whether it is in a public record (we all know more about the Beatles than we do about innumerable cases in F.2d and F.3d, let alone F.), a reasonable diligence instruction is more likely consistent with Washington law, without limitation to official records as a source of knowledge.
 
 
 25
 The instruction perhaps was awkward in its use of the phrase "deemed to know." But it must be read as a whole. The instruction refers to what a creditor "acting with due diligence" would know, "after the exercise of due diligence," "would make a reasonable creditor inquire further," and so forth. This language adequately extends tolling to creditors who would not have known even in the exercise of reasonable diligence of the critical facts. The district judge did not abuse her discretion in the formulation of the instruction.
 
 
 26
 b. Adverse Domination
 
 
 27
 Appellant argues that the district court should have instructed the jury that the statute of limitations was tolled as a matter of law while Pay 'N Pak's board of directors was dominated by Citicorp. We do not see why. Although the unsecured creditors' committee stood in the shoes of Pay 'N Pak after the bankruptcy, the tolling needed to be proved for the period preceding the bankruptcy. During that period a fraudulent conveyance claim accrued to the creditors, not the corporation. The doctrine of adverse domination is designed to protect against loss of a claim where the corporation must assert it, yet is adversely dominated by the party against whom the claim should be asserted. Resolution Trust Corp. v. Farmer, 865 F.Supp. 1143, 1151 (E.D.Pa.1994). It had no application here. As for whether adverse domination of the board could have led the board to hide facts, appellant had the benefit of that theory because the court instructed that the statute of limitations was tolled while a creditor in the exercise of reasonable diligence would not have found out about it.
 
 
 28
 c. Equitable Tolling
 
 
 29
 Appellant argues that the jury was incorrectly instructed on equitable tolling. The court instructed that the statute was tolled "until the date plaintiff, acting with due diligence, could have discovered that it had a claim." The court elaborated, instructing the jury to find tolling "if plaintiff was unable, after the exercise of due diligence, to discover the facts that would have shown plaintiff that the transfers were actual or constructive fraudulent transfers." Appellant requested an instruction that differed in one significant respect: it would have granted the benefit of tolling "[e]ven if the Defendants did not take any action to conceal the facts." But some sort of deception by the defendant, as well as the exercise of due diligence by the plaintiff, are elements of equitable tolling in Washington, as elsewhere. See Finkelstein v. Security Properties, Inc., 76 Wash.App. 733, 888 P.2d 161, 167 (Wash.Ct.App.1995). Thus to the extent that the instructions requested and given were materially different, the district court was right, appellant wrong.
 
 
 30
 d. Section 108(a)
 
 
 31
 Appellant argues that the jury should have been instructed that if the limitations period was tolled and therefore did not bar the claim before Pay 'N Pak filed for bankruptcy, then pursuant to 11 U.S.C. § 108(a), the bankruptcy estate had two years to sue, until September 21, 1993. Appellant argues that it was prejudiced because in closing argument, Citicorp's lawyer told the jury that the committee did not sue for "several years" after the filing of bankruptcy, implying that appellant had delayed long beyond the time that any justification for tolling had elapsed.
 
 
 32
 As to the fourth transfer, any error would certainly be harmless, because the court instructed that "the statute of limitations defense does not apply to Transfer 4." As for the other three transfers, error was most probably harmless, if there was error at all, and if not, the decision not to instruct on section 108(a) was within the district judge's discretion. Because the jury verdict establishes that there was no breach of fiduciary duty and no fraudulent conveyance, even for the transfer for which there was no statute of limitations defense, it is extremely unlikely that Citicorp's lawyer's remark or absence of the instruction made any difference. There was no evidence of the date the complaint was filed, and the evidence and instructions focused entirely on tolling prior to the bankruptcy filing. The jury evidently accepted Citicorp's argument that Pay 'N Pak was not rendered insolvent by the cost of the leveraged buyout.
 
 2. Missing Defendant Instruction
 
 33
 Appellant argues that it was unfairly prejudiced because the district court refused to instruct that it had "sued and made claims against other" defendants, and instead instructed that the jury "should not speculate as to why other individuals or corporations are not part of this lawsuit." Appellant's theory is that it was prejudiced by being made to look as though it was pursuing only Citicorp, because it was a deep pocket, and not suing the people who were responsible for the wrongdoing. The settlements were of course an inappropriate consideration for the jury, and the instruction given was within the court's discretion. No law has been cited to show that the court had a duty to instruct otherwise. To the extent there is law on the subject, it supports the instruction that the district judge gave. Ragsdale v. Southern Pacific Transportation Co., 688 F.2d 1281, 1282-83 (9th Cir.1982) (per curiam).
 
 
 34
 AFFIRMED.
 
 
 
 **
 The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3